### THE A. A. RAVEN.

(District Court, E. D. Pennsylvania. August 22, 1914.)

#### No. 4.

COLLISION (§ 91*)—STEAM VESSELS MEETING—VIOLATION OF PASSING AGREEMENT.

 A collision at night on the Delaware river between the government dredge Delaware which was slowly working upstream to the eastward of the center of the channel and the steamship Raven going down with the ebb tide in the center of the channel when signals for passing port to port were exchanged *held* due solely to the fault of the Raven which, instead of keeping her course or bearing to starboard, swung to port and struck the Delaware at a point some 300 feet to the east of the middle of the channel.

 [Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 187–192; Dec. Dig. § 91.*]

In Admiralty. Suit for collision by the United States as owner of the steam dredge Delaware against the steamship A. A. Raven, O. J. Chalsen, master. Decree for libelant.

Robert J. Sterrett, Asst. U. S. Atty., and Francis Fisher Kane, U. S. Atty., both of Philadelphia, Pa., for libelant.

Harrington, Bigham & Englar, of New York City, and Conlen, Brinton & Acker, of Philadelphia, Pa., for respondent.

DICKINSON, District Judge. Special findings of facts and conclusions of law as reached in this case are filed herewith. The case turns wholly upon the facts. The legal conclusions are merely formal.

An outline statement of the main facts may be given in short compass. The dredge Delaware is used in the work of the deepening of the channel of the Delaware River and Bay. The steamship Raven plies between the port of Philadelphia and New Orleans. They collided on the night of December 5, 1913, about 9 o'clock p. m. The dredge was steaming up the river and the Raven down. The tide was on the ebb; the conditions of wind and weather quiet. Both vessels were within the limits of the Liston Range. They collided at a point near the eastern edge of the channel about opposite black channel buoy No. 3, below Liston Point, in the state of Delaware. The dredge at the time had her tanks full and was engaged in the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

work of what is called "agitating." The thing done is stirring up the loose bottom sediment so that it may be carried downstream. Not considering tide effect the Delaware was moving at a speed of about 5 miles and the Raven 9 or 10 miles per hour. The flow of the tide was at the rate of about 2½ miles. The Raven showed the usual and conventional lights. The Delaware showed, in addition, special lights unauthorized by law and condemned by the judgment of seafaring men. The only color of authority for their use is a regulation of the office of the United States engineers which had adopted the lights as a special signal to be displayed by dredges when at work. The main purpose was to indicate when other vessels should pass them on the one side or the other or indifferently on either side. The lights as displayed meant that the Delaware might be passed either to starboard or to port. They were therefore neutral, and the conditions as to lights the same as if none were shown. It would doubtless be better to show no such lights, because they would be strange and therefore confusing to any one uninformed as to their special meaning. The Raven, however, knew of their use and the purpose of it.

Thus stand the general facts upon which all witnesses are agreed. The controverted facts will appear in such discussion of the case of which there may be need.

It would be easy to take a view of this case upon which the mind could rest satisfied except that it involves convicting the navigators of one vessel or the other of almost unbelievable culpability. Starting with the proposition that the case as presented by the libelant rests upon a finding of the mismanagement of the Raven so gross as to defy credence in the accusation, the proctors for the respondent have built up a theory accounting for what occurred which is most enticing. One criticism to which it is open, however, is that it involves a finding of culpability on the part of the Delaware just as staggering. This criticism is anticipated and met by another theory which accounts for and explains the negligence of the navigators of the dredge. Another criticism to which the respondent's theories are exposed is that they are largely without evidential support, and where there is testimony to support them in part, the testimony is contradicted and the weight of the whole evdence is against the respondent.

The case for the libelant is clear and soon told. The ship channel is 600 feet wide. The range lights give a line up and down mid-channel. The dredge was proceeding in a course to the eastward of this line. The Raven was directly on the range. That the expected course of each vessel was to hold her course or bear to starboard is manifest. The Delaware bore to starboard and the Raven held her course. In passing, each vessel would have had the other on her port bow. The Raven blew her whistle, indicating this. The Delaware answered. The boats should then have passed port to port. The positions of the vessels presented no element of the danger of a collision and suggested none. The space separating the course of each was then about 300 feet. The Raven was following the middle line of the channel and the Delaware was east of this course,

and, having ported her helm, was bearing eastward. With the relative position of ship and dredge, such as described, the Raven put her helm hard to starboard. She had a fairly strong ebb tide under her, and was going over the ground at least 12 miles per hour. The water was smooth. Measured along the range line to a point opposite the point of collision she was 1,000 feet away. The lateral distance was then about 350 feet. She did not slow down, and under the conditions of speed, tide and water prevailing, she swung around on an arc which brought her bow in meeting with the port side of the dredge about 15 feet aft of her stem. With a few feet more the Raven would have cleared the dredge. Such were the movements of the Raven up to this time. In the meantime the Delaware was doing what she could to avoid the collision, which became imminent as soon as the Raven changed her course. The dredge sounded a danger signal, ordered her engines full speed astern to check her headway, and then put her helm hard to port and followed this with her starboard engine astern and port engine ahead. She had been going through the water at a speed of five miles per hour. At this speed with the tide against her, her helm ported, and her engines working as described, she would swing to starboard almost as on a pivot. The result of this movement of each vessel was to push them clear of each other. The tug Gettysburg, with two barges in tow, and several fathoms of line out to her nearest barge, was going up the river about 1,000 feet eastward of the point of collision. The Raven swung so far to the eastward that collision with this first barge was threatened, and indeed seemed imminent, but was avoided by the Raven being swung back into the channel.

This account of what happened is supported by the testimony of those aboard the dredge, the Gettysburg and her two barges, and is consistent with and corroborated by the position of the vessels at and after the collision. These facts compel a finding in favor of the libelant.

It would be interesting, but give undue length to this opinion, to discuss the theory of the collision advanced by the proctors for the respondent, and by which they account for it by throwing the whole blame upon the Delaware and fully exculpating the Raven. The findings of facts which we have felt obliged to reach dispose of the theory by leaving it without any facts for its support.

A decree in favor of the libelant, with an allowance to it of costs, may be prepared and submitted. We have not found the amount of damage, because we have been relieved of this duty by an arrangement between counsel.