### THE A. A. RAVEN.

(District Court, E. D. Pennsylvania. April 5, 1915.)

#### No. 4.

COLLISION ⬳127—ACTION—MEASURE OF DAMAGES.

In an action to recover damages to a dredge owned by the United States and used for harbor improvement purposes, neither the cost of the harbor work to the government nor its value to the commerce of the port affords such a definite measure of the loss due to the interruption of operations as to be made the basis of a claim for damages or be included in any estimate made of the amount.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 281; Dec. Dig. ⬳127.]

In Admiralty. Suit by the United States against the steamship A. A. Raven. On exceptions to commissioner's report. Overruled.

See, also, 216 Fed. 572.

Robert J. Sterrett, Asst. U. S. Atty., and Francis Fisher Kane, U. S. Atty., both of Philadelphia, Pa., for the United States.

Conlen, Brinton & Acker, of Philadelphia, Pa., for respondent.

DICKINSON, District Judge. The argument upon these exceptions necessarily takes on in large measure the academic form. That submitted to us on behalf of the United States is artful (in the compli-

mentary sense of that term), forceful, and in many of its features irrefutable. It does not follow, however, that its deductions must be accepted. It belongs to that kind of argumentation to whose refutation the capacity of the highest intellect may be unequal, and yet the deductions of which would be rejected by a mere modicum of common sense. The explanation of this lies in the truth that its deductions are essentially prophecies, which may be rejected by the unbelieving, but which nothing but the event will confute. There is no difference in this sense between the "profits which would have been" and the "profits which will be" received, except in the tense of the expression. The farmer whose prize hen or favorite cow has been run down and killed by an automobile, if there were lent to him the skilled advocacy of counsel for the United States, could easily "prove" on the basis of the egg-laying qualities of the hen or the butter fat yield of the cow that he had sustained a loss in the one case of $50 and in the other of $1,000. The argument, too, would be difficult to refute. We hold that measure of the ability of counsel to believe by anticipation that it would be unanswerable. The conclusion would without doubt be accepted by the farmer, and without much doubt by counsel, as verity. Every one, however, knows that the man's farmer neighbors would flock to close a contract to restore the owner's entire loss at the price of 80 cents in the one case and $60 in the other. The man who lends the part of one ear to the seductive logic of a promoter will get an alluring vision of "profits which are to be." He may not be equal to the task, even after the event, of breaking the connection between the succeeding steps in the chain of deductions, but what he surely will have is an abiding knowledge that these cloud visions afford a very unstable foundation upon which to erect a storehouse for his money. As already intimated, a prophecy remains a mere prophecy, and has no other value until it has been fulfilled by the event.

The law recognizes, of course, that in many cases the amount of damages which is to be determined can only be ascertained by events which with respect to the time of injury done are in futuro, and that the extent of loss cannot be in actual fact tested by an event the possibility of which is gone. The law requires, however, the application of some measure which has been tested and applied in the common experience and business affairs of life. The library of a chemist or philosopher is destroyed through the negligence of another. The law can admeasure and will allow as damages the market value of the books destroyed. The loss to science or philosophy or the arts, and even in the probable interrupted gains of the owner, may be well-nigh incalculable. Must the party responsible pay this loss? Moreover, the books may not have been destroyed. They may only be damaged and sent to the bookbinder for repairs. There may be a "proven" enforced inactivity on the part of the owner for a long time. Can he be allowed for this? If so, the loss would probably exceed the market value of his entire library. This would involve the absurdity of allowing a greater compensation for damage to a part than for the destruction of the whole. Obviously, the only compensation which the law can compel is a money compensation. This just as obviously requires for its

admeasurement something which will measure the "pecuniary" loss. The measure to be applied must be a real and "tangible" one. It is in this sense that the criticized expressions "pecuniary" and "tangible" have crept into the law. It is true that the proper measure is at times easily found and applied. At others, there is difficulty encountered. A wagon or other vehicle worth $500 is demolished. The wrongdoer admits liability and promptly hands over to the owner $500. Has he not made good the money loss? The vehicle may have been damaged only, and can be restored to its former value at a cost of $100. There is, however, necessarily to be incurred the expense of taking it to the shop, or other outlay or loss directly involved in the injury and capable of expression in terms of money. These may all be elements of damage, but the final award is the admeasurement of the money loss.

This is a long prelude to the legal merits of this case. The dredge Delaware was damaged by being run into by the Raven. The amount of damage measured in the cost of repairs was about $4,000, and in time lost 40 days. The repairs were made by the government itself, and by the leisurely and conservative methods which governments everywhere have found it necessary to adopt. There is probably some truth in the observation that, if the work had been done by private parties, the cost would have been one-half, and the time consumed one-sixth, of that incurred. Counsel for the United States have asked us to apply a rule of measurement of damages which would show a money result which no one has had the courage to figure out. We know it would be many, very many, times the amount of the direct damage done. Counsel for the United States have been moderate, however, and have reduced the claim to between four and five times the government cost of repairs. Instead of claiming credit to themselves for moderation, we would commend to counsel that they ask themselves whether the fact that the measure which they ask to have applied produces such results ought not in itself induce them to inquire into its soundness? One is almost tempted into wondering on what this claim has fed that it has grown so great. This is the basis of it.

The United States is to be viewed as engaged in a money-making business, in which it has invested a vessel at a cost of $400,000, manned by a crew of highly trained and consequently high-salaried men, having an additional plant equipment running into many thousands of dollars, and engaged in a work whose product has an annual cost value of again many thousands. The fact is, of course, admitted that the United States is not a money-making organization, and that in its improvement of our harbors it is not seeking a direct money profit from the work. It further must be admitted that, although the work it does is not only necessary and highly beneficial, and of immense and indeed incalculable benefit, the value of this flows to the commerce of the country and yields no direct profit to the government which does the work. The value of what it does is not only great, but absolutely immeasurable, in the sense of determining the money loss involved in the cessation of it for a limited time. The fact that such a thing is immeasurable suggests the folly of attempting to measure it.

Counsel argue that value has been lost to the United States at least

equal to the cost of the work. This is, however, a double assumption, the first part of which does not apply to other litigants. A man might, if he chose, build a boat for himself at a cost of $500,000 and spend $50,000 a year in the use of it. He might well argue that he received the value of his expenditures in the pleasure it afforded him to have a boat which was the product of his own hands. If, however, the boat were run down, would the court trying the case be required to allow the owner damages for loss of use on the basis of what it cost him to run his boat, and interest on his investment, in addition to the cost of restoration? If an answer to this question is needed, it can be found in The Conqueror, 166 U. S. 129, 17 Sup. Ct. 510, 41 L. Ed. 937.

The general rule is there can be no allowance for loss of use, unless loss of profits can reasonably be found and there is reasonable proof of the amount. Here neither is present. The decree providing for the ascertainment of the damages in this case was made as a matter of course, without its terms being brought to the attention of the court. Had it been, the measure which the commissioner has applied would have been specifically provided for. He has evidently considered the case with characteristic care and level-headedness, and has made a liberal allowance for all the damage shown.

The exceptions to the report of the commissioner are dismissed, and the report confirmed.