THE A. A. RAVEN.

(Circuit Court of Appeals, Third Circuit. February 28, 1916. Rehearing Denied April 20, 1916.)

No. 2056.

1. COLLISION ⬙⟿91—STEAM VESSELS MEETING—COMMON FAULTS.

A collision occurred at night on the Delaware river between the steamship Raven, passing down, and the large government suction dredge Delaware which was at work and moving up the river about on the range line. The deep channel was about 600 feet wide, and the dredge carried the regulation lights, showing that she was at work, but that approaching vessels might pass on either side. *Held*, on conflicting evidence, that both vessels were in fault; the dredge for failing to maintain an efficient lookout, by reason of which she started to turn around to the eastward before seeing the Raven, or in the belief that she was farther away than she was, and the Raven for not signaling her intention to pass to the eastward of the dredge, and for not changing her course to the westward when she saw the dredge beginning to turn.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 187–192; Dec. Dig. ⬙⟿91.]

2. COLLISION ⬙⟿129—DAMAGES RECOVERABLE—WAGES OF CREW DURING REPAIRS.

A government dredge, injured in collision so as to necessitate repairs, employed a crew of 58 men. These men were not ordinary seamen, but were selected with care for their skill, efficiency, and experience in operating the dredge; some of them having been employed thereon for a number of years. The court found that three weeks was a reasonable time for making the repairs. *Held*, that the government was not required to discharge such men to save expense to the other vessel in fault, but was justified in keeping them, and was entitled to allowance as a part of the collision damages of the amount expended for their wages and maintenance during the three weeks.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 283; Dec. Dig. ⬙⟿129.]

Appeal from the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

⬙⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Suit in admiralty for collision by the United States against the steamship A. A. Raven. From the decree, both parties appeal. Reversed on both appeals.

For opinions below, see 216 Fed. 572, and 222 Fed. 958.

Harrington, Bigham & Englar. of New York City, Conlen, Brinton & Acker, of Philadelphia, Pa. (D. Roger Englar, of New York City, and Jasper Y. Brinton, of Philadelphia, Pa., of counsel), for the A. A. Raven.

Francis Fisher Kane, U. S. Atty., and Robert J. Sterrett, Asst. U. S. Atty., both of Philadelphia, Pa.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

McPHERSON, Circuit Judge. In this action for collision by the steam dredge Delaware against the steamship A. A. Raven, two appeals are before us, one by the Raven from so much of the decree as adjudged her to be solely in fault (216 Fed. 572), and the other by the United States, the owner of the dredge, from the award of damages (222 Fed. 958). We shall consider the appeals in their order.

## Appeal of the Raven.

[1] The collision took place not long after 9 o'clock on the evening of December 5, 1913, on the Liston range of the Delaware river, a few miles above the head of the bay. There was no wind, and the tide was three-quarter ebb running about 2½ miles an hour. The night was clear; the half moon was occasionally obscured by thin clouds, but lights could easily be seen at the usual distance, and the moon (which was probably 3 hours high) helped to show the outlines of objects that were fairly near. The Raven is a freight steamship, 261 feet long, 43½ feet beam, with a capacity of 4,000 tons. She draws 24½ feet when fully loaded; on this voyage she had only half a cargo, and her draft was 18 feet aft and about 13 feet forward. She was bound south for Charleston, and was moving at full speed, probably 12 miles over the ground. The Delaware is a large steam dredge owned by the government, and was employed at the time in deepening the channel of the river. She is 315 feet long, displaces 6,400 tons, and has a maximum draft of 22 feet. She has an engine for each of her twin screws, and can turn with comparative ease—as her second officer testified, "in a space of 600 feet." She is a suction dredge, drawing up the silt through 18-inch pipes, one on each side; the silt being pumped into bins on board and carried to the place of deposit. On the night in question her bins were full, but she was still "agitating"—that is, her pipes were down and she was sucking up the silt, but this was allowed to run through the sluices in order that the tide might carry it away. She was moving upstream about 2 miles an hour over the ground.

Each vessel carried the ordinary running lights, all in order and burning brightly; in addition, the dredge carried four red lights, which the government asserts to be authorized by section 11 of the act of 1902 (Act June 13, 1902, c. 1079, 32 Stat. 374 [Comp. St. 1913, §

9861]), and by the regulations adopted thereunder. Section 11 is as follows:

"That it shall be the duty of the Secretary of War to prescribe such rules and regulations for the use, administration, and navigation of any or all canals and similar works of navigation, that now are, or that hereafter may be, owned, operated, or maintained by the United States, as in his judgment the public necessity may require; and he is also authorized to prescribe regulations to govern the speed and movement of vessels and other water craft in any public navigable channel which has been improved under authority of Congress, whenever, in his judgment, such regulations are necessary to protect such improved channels from injury, or to prevent interference with the operations of the United States in improving navigable waters, or injury to any plant that may be employed in such operations. Such rules and regulations shall be posted in conspicuous and appropriate places, for the information of the public. * * *"

Paragraph 7 of the regulations provides that:

"Dredges shall display by day a black ball 3 feet in diameter at the end of a horizontal spar extending to the line of the side of the dredge's hull, and at a height not less than 30 feet above the water, the ball to be set on the side of the dredge on which it is desired approaching vessels shall pass.

"Dredges shall display by night one white light on a staff in the middle of the dredge, and at least 30 feet above the water, to serve as the regulation anchor light, and 4 red lights suspended in a vertical line from the outer end of the horizontal spar used by day for the suspension of the black ball, the lights to be set on the side of the dredge on which it is desired approaching vessels shall pass. If approaching vessels may pass on either side of the dredge, no day mark shall be displayed, and by night the four red lights shall be displayed in a vertical line directly under the above-mentioned white light."

When the Delaware began dredging 10 years ago, she made public the following notice:

"The U. S. dredge Delaware will commence dredging in the Delaware river channel on March 28, 1906. When the dredge shows two blue flags (one on the foremast and one on the mainmast) in daytime, or four red lights (two on the foremast and two on the mainmast), at nighttime, she is engaged in dredging and is practically unmanageable; therefore all vessels are notified to give her as much room as practicable."

In accordance with this notice two lights in a vertical line were displayed on each mast of the Delaware on December 5th, and, although this arrangement did not follow exactly the paragraph quoted from the regulations, it indicated sufficiently to the Raven (to whom the dredge's presence in the river was well known) that a vessel about to pass was at liberty to choose either side.

Each vessel asserts that she saw the other in ample time and with ample room to pass in safety, and blames the collision on a sudden and unannounced change of course on the part of the other. They agree that one of them did make such a change, and they agree also that the contact was nearly at right angles on the eastern edge of the 30-foot channel. At this point the channel is about 600 feet wide, and on its western edge a black buoy (No. 3L) is nearly opposite the place of the disaster. The Raven struck the port bow of the dredge, a few feet aft of the stem, twisting her own stem round to port. All the witnesses of the Raven except one testified by deposition between April 10, and July 20, 1914; the witnesses for the dredge being heard in open court

on July 9. The District Judge adopted the theory of the government, and held the Raven to be solely in fault (216 Fed. 572); but he did not attempt to assign any motive or reason for the extraordinary maneuver that she must in that event have made. Since this is a case of collision, we expect to find positive contradiction between the two groups of witnesses; but, if a probable reason can be found for one account rather than for the other, this should help us to decide the conflict, or perhaps even to reconcile it in part. A prolonged and careful study of the record has led us to believe that the order of events was as follows:

The business of the Delaware was to dredge to and fro on the Liston range between black buoys No. 1L and No. 3L; No. 1 being about two miles south of No. 3. As her master testified, the work was to be done on the range line:

"We are supposed to work on the range and keep the center line down.
"Q. At that time your instructions were to work on the center line?
"A. Yes.
"Q. Not on either side?
"A. No, on the ranges; but * * * we do not stay on the center line when there is a ship passing by."

And the second officer testified:

"We have orders to dig on a range, and that means the middle of the channel. * * * We are not instructed to dig outside of the range, but we are instructed to keep away from the vessels which are coming down on the range."

On the night in question the dredge turned at No. 1 and started up stream to No. 3. This was about 8 o'clock, and not long afterward the steamship Mongolian overtook her, and passed on her starboard side, the dredge being then about in the center of the channel. In a short time her sister dredge, the Manhattan, which was working down the range, met and passed her port to port, the Delaware being still near the range. Farther up, she met the steamship Lexington coming down, and passed her starboard to starboard; she herself being somewhat westward of the range, and the Lexington being somewhat to the eastward. Behind the Lexington—"right astern of her," as the Mongolian's pilot testified—came the Raven, and we understand this testimony to mean at least that she was not far behind. At this time the tug Gettysburg, towing three empty barges tandem up to Philadelphia, was some distance astern of the dredge, and 1,000 feet or more to the eastward of the range. She was out of the channel altogether, was obviously not a source of danger to any vessel on or near the range, and was not as favorably placed for accurate observation as the other vessels named. She was moving more rapidly than the dredge, and at the time of the collision had come to a point practically opposite buoy No. 3, or perhaps a little below. Considering the distant and disadvantageous position of the tow, the evident bias of her three witnesses, the improbable precision that marks much of their testimony, and the variation in the two accounts they gave, we find ourselves unable to rely with confidence on what they said at the later hearing, and cannot regard it as of special value. Taking all the evidence together, we

incline decidedly to the conclusion that the dredge was where her business required her to be, where the work was ordered to be done, namely, somewhere near the line of the range. On this point much of the testimony will continue to be directly in conflict; but we attach a good deal of weight to the fact that, if we should assume the dredge's theory to be correct, namely, that she was coming up on the eastern edge of the channel, the Raven's change of course is then without a discernible motive, and indeed can hardly be accounted for, except by supposing that her navigating officer had taken leave of his senses. The dredge's account requires us to believe that, after the vessels had exchanged passing signals, port to port, their positions being then perfectly safe, the Raven—a loaded vessel, bound for sea, and going down on the range, with nothing at hand to crowd her eastward—nevertheless, on a clear, bright night, deliberately and without reason left her course and her safe position, turned several points to the eastward in violation of her signal, and in effect ran the dredge down. On the face of things this theory is unlikely, and needs strong evidence to establish it, and we think it should yield to a more probable view of the facts, and especially since that view is supported by testimony quite as weighty as the theory of the dredge.

How, then, is the collision to be accounted for? At this point let us turn to the Raven, and try to realize the situation produced by her appearance on the scene. Her master and her third officer were on duty, a quartermaster was at the wheel, and an experienced seaman was on lookout. When she turned from the Baker range into the Liston range, she was nearly 4 miles above buoy No. 3. The Delaware had had nearly an hour to cover the 2 miles from No. 1, and could not have been far south of No. 3. As the collision took place shortly after 9 o'clock, she was probably about half a mile below No. 3, and of course had an open view to the top of the range. How soon did she see the Raven, and what was done?- And here we have the advantage of testimony that was not before the court below. The dredge was in sole charge of the second mate, with whom were a quartermaster at the wheel and a seaman supposed to be on duty in the bows. The quartermaster was not under obligation to look out for lights, and on this subject of lights the lookout did not testify at the trial; he was not produced, and no proof was offered that an effort had been made to find him. The failure to call this witness below, or account satisfactorily for his absence, afforded ground for presuming that his testimony would not support the dredge's case (The New York, 175 U. S. 204, 20 Sup. Ct. 67, 44 L. Ed. 126); and we are not sure that the presumption has been entirely removed by the belated agreement to permit the inspectors' notes to be read. He had been questioned by the inspectors a few days after the collision, and the Raven offered in evidence the notes of that examination. These (being ex parte) were properly excluded by the District Judge on the government's objection. On the argument of this appeal, however, the objection was withdrawn and the parties agreed to make them a part of the record. They show that the lookout was a deckhand who had only had nine weeks' experience as a seaman; that none of the officers had ever given him orders about his duty as a lookout; and that he

"supposed" he was to report lights, because he had heard some of the sailors say so. The notes then go on as follows:

"Q. How far off was the Raven when you first saw her?
"A. I don't know how far she was.
"Q. When you first saw her did you report her to the officer on watch?
"A. No, sir.
"Q. How long after you first saw her did you hear any signals blown or exchanged between these vessels?
"A. I only heard one signal.
"Q. How far apart were they when you heard it?
"A. I didn't see.
"Q. Did you hear the whistle?
"A. I heard our whistle.
"Q. Did you hear her whistle?
"A. No.
"Q. Had she blown a whistle, do you think you could have heard it from where you were?
"A. I don't know.
"Q. Do you know what this whistle signal was that was blown by your vessel?
"A. It was one blast.
"Q. When this signal was blown, did you notice what lights were being shown on the Raven?
"A. No, sir.
"Q. Did you hear any other whistle signals blown by the Raven or the Delaware?
"A. No, sir.

*       *       *       *       *       *       *       *

"Q. When you were standing your lookout, did you stay on the lookout from the time you got there until it was time for you to be relieved by the other lookout?
"A. No; I did not.
"Q. What were you doing at the time that you should have been on the lookout?
"A. I was down doing nothing.
"Q. When you were down doing nothing, who was on the lookout then?
"A. Nobody."

It is conceded that he made no report that night, thus leaving the second mate to bear the responsibility of lookout in addition to his other duties. Certainly this is not the vigilance required of vessels in a narrow channel, and must be taken into account in determining what probably occurred.

The position of the dredge being ascertained to be near the line of the range, most probably somewhat to the westward, it is evident that her account of what lights she saw on the Raven, and how far away she saw them, needs to be modified. She received no help in this direction from her inefficient and apparently inattentive lookout, and the likelihood of the situation is not in favor of her account. We believe, however, that at some time she did give a signal of one blast; but in our opinion she did not give it until the vessels were much closer together than she had supposed, and until the danger of collision was already threatening. As we see the situation from the record, what happened was this: When they were at least a mile apart, the vessels were nearly head on, both being near the range. The Raven made out the approaching vessel to be a dredge, and saw that her peculiar lights indicated that she was at work; this meant that, if

she was moving at all, she was moving slowly—was "practically unmanageable," in the language of the notice quoted above—and, as the position of the vertical lights showed that she might be passed on either side, the choice of sides was thus left to the Raven. She chose the eastern side and started to execute the necessary maneuver. As the combined speed of the vessels was about 14 miles, they were approaching each other rapidly. The dredge had now nearly reached the buoy where she was to turn and work down stream, and, having failed to notice the Raven at all, or (as perhaps is more likely) supposing her to be farther away than was the case, she started to make the turn, believing that she could do so safely. This belief might have been justified, if, as she contends, she had already given ample notice by signal that she was going to the eastward. But, even if no signals had been exchanged, she might still mistakenly believe that she had plenty of time to get out of the way. Whatever the fact about the signals may be, she had scarcely begun the eastward movement when she discovered that the Raven was so near that the turn was hazardous. It was too late to go back, however; she was now committed to the maneuver, and she then did all that was possible under the circumstances. At that time at least, if not before, she blew one blast, and followed it almost immediately by the danger signal, starting her engines full speed astern and putting her helm hard aport, so as to turn to the eastward as rapidly as she could. The effort was unavailing, for, although the contact may have been delayed by these maneuvers, it could not be avoided, and the vessels came together as described above.

From the foregoing account the faults of the Delaware are sufficiently clear. She did not have a competent and attentive lookout, and she undertook a dangerous maneuver when she was too near the other vessel. And we agree that the Raven was also at fault. If her testimony be accepted, she gave no signals whatever from the beginning to the end, and assuming this to be true she cannot be absolved for such an omission. Her excuse is that, as she intended to pass between the Delaware and the Gettysburg, she feared to mislead one or the other of the vessels, and therefore refrained from signaling at all. We do not regard the explanation as sufficient. The Gettysburg was too far over to be misled by a starboard passing signal; she could not possibly suppose that such a signal was intended for her, since it would require the Raven to take the extraordinary course of leaving the range and the channel altogether in order to pass the tow on its starboard or eastern side. As the steamship intended to pass the Delaware starboard to starboard, she ought to have given the appropriate signal. She may have regarded the Delaware as "practically unmanageable," and may have believed that she herself had the choice of sides; but even in that event she was taking the risk of an unexpected movement on the part of the dredge, and that risk she could have avoided, or at least could have minimized, simply by giving the proper passing signal. This fault alone is sufficient to charge her with contributing negligence.

And we think she also committed a fault by persisting in her swing to the eastward and in maintaining her speed after she knew that the

Delaware was moving in the same direction. Her explanation is that by keeping her course and speed she thought she might be able to cross the dredge's bows in safety, and she points to the fact that the blow was so near the dredge's stem as to indicate that she nearly succeeded. This does not seem to be quite accurate. As we understand the situation, she was still far enough from success; obviously, it would not have helped matters to place herself across the Delaware's bow, for (instead of herself) the dredge would then have been the striking vessel. In our opinion the only chance of avoiding the collision after the dredge's mistake was for the Raven to stop and reverse, and make every effort to go to the westward in order to pass under the dredge's stern. As we see it, such a maneuver was less dangerous than to follow the other vessel to the eastward, and in our opinion it had a fair chance of success and should have been adopted.

We hold both vessels therefore at fault, and direct the court below to modify the decree accordingly.

### Appeal of the United States.

[2] Having found the Raven solely at fault, the court below on September 10, 1914, appointed a commissioner to ascertain the damages, setting forth in the interlocutory decree that the—

"* * * damages [were] to embrace the reasonable cost which should have been incurred in making necessary repairs to the said Delaware, together with the amount of wages and cost of supplies and maintenance which should reasonably have been incurred in maintaining the said Delaware during the estimated period or periods of said repairs."

As stated by the District Judge in his opinion (222 Fed. 958), considering the commissioner's award, this decree "was made as a matter of course, without its terms being brought to the attention of the court."

And this may account for the government's application in November to amend the concluding clause of the decree. At all events the government did seek to amend that clause so as to make it read as follows:

"Together with the damages suffered by reason of the detention of the said Delaware during the reasonable period of repairs, which shall be measured by the reasonable cost of operating the said dredge during a period equal to the said reasonable period of repairs, including depreciation."

The court refused to allow the amendment, and the refusal is one of the errors now assigned. But we need not consider it, for in our opinion a controlling question raised by the record is well within the terms of the unamended decree, as will appear by a brief summary of the commissioner's award, which was approved by the court below.

During the hearings, which ended late in October, the government asked no allowance for depreciation, nor for the estimated value of the excavation that might have been done while the dredge was idle, but confined its claim to the actual cost of repair, and to the wages and maintenance of the full crew during the time consumed in that work. The commissioner fixed the sufficient, and therefore the reasonable, time at 21 days, instead of 40, and allowed the wages and maintenance of only 10 men (instead of 58), adding these sums to the cost of re-

pairs with one or two other expenditures. He recommended a decree made up of the following items:

Reasonable amount required in making repairs to the dredge.......$3,842.75
Charge for docking .............................................. 221.23
Charge for tug hire ............................................. 37.50
Reasonable amount of wages to crew and officers for 21 days or 21/30
of monthly pay roll of 10 men ................................. 598.50
Cost of maintenance for 10 men for 21 days, at $1 per day........ 210.00
Vessel supplies for 21 days ..................................... 229.07

Total ................................................$5,139.05
Interest on same from January 14, 1914, to September 10, 1914, date
of decree ................................................... 202.13

$5,341.18

The government assents to the reduction from 40 days to 21 days, and makes no complaint now, except that wages and subsistence should have been allowed for the full crew, instead of for the 10 men whom the commissioner regarded as a sufficient complement during the period of repair. The amount in issue is $1,863.72.

The situation is unusual, and the question presented has had our serious attention. In the first place we observe that all the items contained in the foregoing list are accepted as far as they go. The sole objection is that some of the allowances should have been large enough to provide for the whole crew. Confining our attention, therefore, to this matter, we start with the fact that the repairs were finished within a reasonable period, fixed by the commissioner at 21 days. To this finding neither party is now objecting. The period being reasonable, and nothing being in dispute except the number of men, we come to consider the ground on which the propriety of such an allowance should be determined. And we note, also, that the government is not claiming for loss of profits, or for losing the use of the dredge; it is simply asking to be reimbursed for money actually paid out for wages and supplies. No speculative element enters into the discussion; a definite amount has been ascertained, and the only inquiry is whether the government should be repaid a sum of money that has already been spent. Should this sum be charged against the Raven? We lay aside, as not in point, the case of The Conqueror, 166 U. S. 125, 17 Sup. Ct. 510, 41 L. Ed. 937, a decision much relied upon by the court below, and relied upon now by the Raven's counsel. As we understand the opinion there delivered, the important question presented to the Supreme Court was: What damages for unlawful detention should be awarded to the owner of a private yacht, intended and actually used solely for his own pleasure? He had lost no money by reason of losing her use, and had been debarred from no profits. He had, of course, suffered inconvenience, and his pleasure had been interrupted; but, as no measure is known for estimating such damage accurately, he was allowed no compensation therefor. In that very case, however (166 U. S. 134, 135, 17 Sup. Ct. 510, 41 L. Ed. 937), the owner *was* reimbursed for money actually paid out for wages and supplies during part of the period. For several weeks the yacht had been detained by the collector of customs, and during this time the

whole crew had remained on board under pay. They had rendered little actual service, and had been kept on the vessel more as a matter of precaution than because their presence was essential. The vessel was at anchor in New York Harbor, and the reason for keeping them was the fear that some contingency might arise that would call for the service of the whole crew. The expense of keeping them all was allowed for as reasonable, but after the yacht was removed to the Erie Basin, where no one could be needed except caretakers, the allowance was reduced to the pay of a few men.

In whichever form the question may be stated—whether a given number of men is necessary, or whether such a number is reasonable —the words "reasonable" and "necessary" carry practically the same meaning. Each situation must be taken by itself, and the inquiry is: What allowance should be made under the particular circumstances? We agree with the government's argument that the crew of this dredge differs from the crew of the ordinary vessel. A dredge is a floating machine, not a boat for commercial use, and of necessity most of her men are rather artisans or mechanics than common seamen. They must be familiar with machinery of one kind or another, and cannot be easily replaced from the wharf or a sailors' lodging house. In this instance, many of the crew had been employed for a considerable time, their periods of service ranging from seven years to a few months— see the government's list—and they had become so experienced and efficient as to be important factors in the particular work then being done. They had been sifted out from many others, and had been chosen, not only because of their skill and experience, but also because they were sober and reliable. Now, was it reasonable or unreasonable to retain such a crew intact during a period that has been found to be of no more than reasonable length? Was the government obliged to disperse an organized force, gathered with such care, and run the risk of reassembling the men after the vessel should be ready to resume work? No doubt many of them were practically idle on board the dredge while she lay in the dry dock. Should they have been discharged in order to save expense to a wrongdoer? If the situation is to be tested by what an ordinarily prudent business man would do—and both parties ask us to apply this test—we think only one answer is probable: Such a man would keep the crew together for three weeks under pay rather than risk their loss. The case might be different if the crew were of the usual type—wandering sailors without special skill or mechanical training, such men as can nearly always be found in a large port like Philadelphia. And the case might be different, also, if we were dealing with a time that would appear at once to be unreasonably long. Conceivably we might not find it easy to draw the line. No one would contend that a crew like this should have been discharged, if the repairs had been likely to be finished within three or four days. Would a week be too long? Or two weeks? Or three weeks? In the present inquiry, we are much assisted by the commissioner's finding, and the assent of both parties, that three weeks was a reasonable time for the necessary work; and we feel justified, therefore, in adding our own agreement on this sub-

ject, and in reaching the conclusion that the government did not go too far in keeping this exceptional crew together for the period thus fixed. There is no doubt that the government was acting in good faith, for it keeps the crew together when the work is interrupted by repairs or by unfavorable conditions. And in determining the question before us there is some force in the fact that negotiations were pending from December 5, to December 18, by which the government was delayed in deciding to repair the vessel at League Island—a delay for which we think neither party should fairly be held responsible.

On each appeal, therefore, the decree must be reversed. If the parties do not agree on the amount of the Raven's damages, a further inquiry will be needed before the commissioner; if they do agree, the District Court is directed to modify its decree in accordance therewith, and with this opinion. And we direct, also, that the costs below and in this court be equally divided.