## THE COMMONWEALTH. THE NEW HAMPSHIRE. UNITED STATES v. NEW ENGLAND S. S. CO.

(District Court, S. D. New York. June 11 and 15, 1923.)

1. **United States ☞142—Special act held to authorize interest on damages for collision recovered against United States.**

Allowance of interest on damages for collision recovered by cross-libelant against United States *held* authorized under a special act authorizing the cross-libel and providing that the court should enter a decree for damages to either party on the same principles and measure of liability as in like cases in admiralty between private parties; the United States having made a claim for interest.

2. **Collision ☞129—United States held entitled to drydocking charges during repairs to naval vessel as damages of collision.**

On libel for damages to a United States naval vessel in a collision, the government *held* entitled to drydocking charges during repairs at a government drydock; the fact that the government had other docks which were not in use, or that it was not likely to and actually was not called on to use commercially, being immaterial.

3. **Collision ☞129—Limit of drydocking charges against naval vessel allowed to United States for collision stated.**

The limit of drydocking charges against a naval vessel allowed to the United States as damages for collision *held* to be the reasonable charges for the time actually necessary to make the repairs, and the charges made to private vessels, while not controlling, could be used as a guide.

4. **Collision ☞129—Damage allowed to United States for collision with naval vessel properly based on time and number of men reasonably necessary for repairs.**

On libel for damages to a United States naval vessel in collision, an allowance for repairs based on the time and number of men reasonably necessary to make the repairs, which excluded any increase due to navy regulations, *held* proper.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**5. Collision ⬦⟹129—Wages and maintenance of crew of naval vessel held properly allowed as damages for collision.**

> On libel by United States for damages to a naval vessel in collision, an allowance for wages and maintenance of officers and men while the vessel was being repaired *held* proper, regardless of the fact that the men would probably have been retained by the government, since it was not obligated to do so; the fact that the men so engaged gained valuable experience not being matter to be considered, since it was for the government and not the chance of collision to determine if, when, and how they should receive their training.

In Admiralty.   Libel by the United States against the steamship Commonwealth.   The New England Steamship Company, as claimant of the Commonwealth, filed a cross-libel against the United States to recover its damages.   Decree in accordance with opinion.

William Hayward, U. S. Atty., of New York City (Anthony M. Menkel, Sp. Asst. U. S. Atty., of New York City, of counsel), for the United States.

Haight, Smith, Griffin & Deming, of New York City (Clarence Bishop Smith, of New York City, of counsel), for The Commonwealth.

MACK, Circuit Judge.   While the United States steamship New Hampshire was at anchor in Newport Harbor, between 4 and 5 a. m., July 7, 1912, the steamship Commonwealth collided with her.   She was exonerated by a naval court of inquiry.   The government then libeled the steamship Commonwealth to recover its damages; and by virtue of a special act of Congress, the material part of which is quoted below,[1] the New England Steamship Company libeled the government to recover its damages.

1 "(Private–No. 7, 63d Congress)

"(H. R. 9848)

"An act for the relief of the New England Steamship Company.

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, that the claim of the New England Steamship Company, owner of the American steamer Commonwealth, alleged to have been injured in collision with the United States battleship New Hampshire on or about July seventh, nineteen hundred and twelve, in or near Newport Harbor, for and on account of the alleged damage to said steamer Commonwealth by reason of said collision, may be submitted to and cross-libel against the United States filed in the United States District Court in the district in which suit has been or shall be commenced by the United States to recover for damages to the said battleship New Hampshire resulting from said collision, under and in compliance with the rules of said court sitting as a court of admiralty; and the said court shall have jurisdiction to hear and determine the whole controversy and to enter a judgment or decree for the amount of the damages sustained by reason of said collision, if any shall be found to be due, either for or against the United States, upon the same principles and measure of liability, with costs, as in like cases in admiralty between private parties and with the same rights of appeal; provided, that said cross-libel shall be filed not later than four months after the passage of this act.

"Approved, February 20th, 1914."

Judge Hough, holding both vessels at fault, referred the causes to E. L. Owen, Esq., as commissioner, to ascertain and report the damages. The commissioner rendered his report, dated February 2, 1922, finding, per stipulation, the damages of the Commonwealth in the sum of $59,761.23, and holding that interest was allowable upon the several items that make up this total. He further found damages of the United States of America to be as follows:

Total maintenance and care during temporary repairs and navi-
    gating the New Hampshire to Brooklyn Navy Yard.............. $ 2,703.26
Interest from July 14, 1912—
Cost of repairs to New Hampshire at the Brooklyn Navy Yard.... 24,945.57
Interest from October 11, 1912—
Cost of maintenance and care of the New Hampshire while under-
    going repairs at the Brooklyn Navy Yard...................... 13,645.00
Interest from October 11, 1912—

The second of these items was stipulated: The commissioner reports that counsel for the Commonwealth substantially admitted that something was to be allowed on account of the first and third items. Counsel deny, and the record fails to show such admission. In determining the amount of the damages on these two items, the commissioner held that the United States was entitled to recover for the wages and subsistence of a reasonable number of officers and men on the New Hampshire for her care and maintenance during a reasonable period for repairs, both temporary at Newport and permanent at the Brooklyn Navy Yard, and of the necessary number to navigate her from Newport to the Brooklyn Navy Yard, but disallowed the claim of a full complement of officers and men on the New Hampshire from the time of the collision until her arrival at the Brooklyn Navy Yard, and for a larger number than he found reasonably necessary during the permanent repairs.

The government's claim for the use of the Navy Yard dry dock by the New Hampshire, while undergoing repairs, was disallowed on the ground that the government thereby suffered no damage because all the other docks at the yard were unoccupied during this period.

The matter is now up on exceptions and cross-exceptions to the commissioner's report: By the New England Steamship Company, as owner of the Commonwealth as follows:

(1) In that the commissioner allowed the United States of America to recover as damages $2,703.26, the wages and subsistence of 11 officers and 232 men of the crew of the New Hampshire while she was undergoing temporary repairs and being navigated to the Brooklyn Navy Yard.

(2) In that the commissioner allowed the United States of America to recover as damages $13,645, the wages and subsistence of 8 officers and 62 men of the crew of the New Hampshire, while she was undergoing permanent repairs at the Brooklyn Navy Yard.

By the government as follows:

(1) In that the commissioner erred in allowing interest against the United States upon the amount of damages and expenses of the Commonwealth.

(2) In that the commissioner erred in not giving proper weight to and in rejecting the testimony of Capt. Preston, Commander Crosap, and Lieut. Commander Zimmerman, all of the United States Navy, on the ground that each officer's estimate of the number of officers and men necessary properly to care for and maintain the battleship New Hampshire while undergoing repairs at the Brooklyn Navy Yard was based on rules and regulations of the Navy Department, instead of irrespective thereof.

(3) In that the commissioner erred in omitting to allow the United States compensation for the use of its dry dock, in which the New Hampshire was placed while undergoing repairs.

(4) In that the commissioner erred in holding that the government has failed in any manner to maintain its claim for expenses in caring for and preserving the New Hampshire while undergoing repairs.

[1] 1. *Interest.* The Private Act does not regulate merely the action by the New England Steamship Company; it expressly covers both actions; it provides for judgment or decree either for or against the United States upon the same principles and measure of liability as in like cases in admiralty between private parties.

Concededly, if both were private parties, interest would be allowed; the United States asserts its right to interest, but it denies the counter right. In my judgment, if the United States is entitled to interest, then under the fair construction of the act, a similar right is given to the other party. That the United States is so entitled has not been and cannot be denied.

There is no similarity to the language of the act considered in Watts v. U. S. ([D. C.] 1904) 129 Fed. 222. While the language of the act in Pennell v. U. S. ([D. C.] 1908) 162 Fed. 75, is nearer, that act did not purport to give mutual rights and remedies by libel and cross-libel; it provided only for an action against the United States. In suits brought in the Court of Claims, the statute expressly prohibits allowance of interest except as therein specifically provided. U. S. v. North American Co. (1920) 253 U. S. 330, 336, 40 Sup. Ct. 518, 64 L. Ed. 935.

[2, 3] 2. *Drydocking.* The government had five dry docks at the yard; except for the use in question, all were idle during the repairs. While they were not intended for profit in the sense that they were intended to be used by others for commercial purposes, the evidence shows, however, that when suitable commercial docks in the vicinity were unavailable, the Navy Department, twice in the year 1913, permitted private vessels to use them and made a charge therefor. Moreover, the government erected and maintained these docks as a substitute for renting the dry docks of private owners, temporarily or permanently; in that sense their use was commercial. That the New Hampshire was a naval vessel cannot differentiate the case from that of The A. A. Raven (C. C. A. 3, 1916) 231 Fed. 380, 145 C. C. A. 374, in which drydocking charges during the repairs of a government dredge at a government owned yard and dock were allowed. The difficulty in The Conqueror (1897) 166 U. S. 110, 125, 17 Sup. Ct. 510, 41 L. Ed. 937, was primarily that the inconvenience suffered by the owner of a pleasure yacht through temporary deprivation of its use is not measurable; therefore no damages are recoverable. The value of the use of this

dock is clearly measurable. That the government had other docks which were not in use, or that it was not likely to be and actually was not called upon at this time to use any of them commercially, should not differentiate its claim from that of a private ship and dock owner in a like situation using one of his otherwise unused docks for the repair of his own ship.

The limit of this item of the damages is the reasonable charges for the time actually necessary to make the repairs. The charge made to private vessels, while not controlling, may be a guide in determining the reasonable charges for the use of the dry docks.

[4, 5] 3. *Wages and Subsistence During Repairs and Navigation to Brooklyn.* If anything is to be allowed, the amounts found by the commissioner, based on the testimony of the Commonwealth's experts, are not strongly contested. In any event, I agree as to amount with his conclusions.

I find, however, nothing in the stipulation or record to bar the New England Steamship Company from contending that there is no liability as a matter of law. This contention is based upon the character of the New Hampshire as a public naval vessel, not used for profit earning but for training and military service; that it would have maintained at least as many officers and crew had there been no collision; that the collision afforded indeed an excellent opportunity to train the men in the doing of things essential properly to fit them for their military service; that the out-of-pocket wages and subsistence both during the repairs and the navigation in question are not at all due to the collision, for, as the service was decidedly undermanned at the time, the Navy required and would in any case have retained these men as it did retain the entire complement; that therefore, on the principle of restitutio in integram underlying the award of damages in admiralty, no damages can be awarded for these items, even though they are readily measurable. There is no difficulty in establishing the actual damage; the commissioner, in my judgment, properly accepted the estimates of the Commonwealth's witnesses as to the minimum number of men and time reasonably necessary for the work and thereby excluded any increase due not to the necessities of the case but to Navy regulations. On authority the case is not to be differentiated from the Conqueror in this respect. There no question was raised as to the out-of-pocket expense, though in analogy to the Commonwealth's argument it might have been urged that the maintenance of that yacht while detained was very much less than it would have been if used for the owner's pleasure and recreation, and therefore no loss even of out-of-pocket money was incurred.

While it may well be that the experience gained by the enlisted men in handling the disabled vessel and in watching, supervising, or aiding in its repairs was just what they needed the better to fit them for the emergencies of the recent war, it was for the government and not the chance of a collision to determine if, when, and how they should receive their training. And while it may well be that the government would have retained their services, it was not obligated in any way so to do. I concur in the commissioner's report on this item.

Unless the parties will stipulate the amount of the damages that, under the evidence, should be added for use of the dry dock, the cause will be referred to the commissioner for his determination of this item.

### Supplemental Opinion.

My attention has been called to the claim that while the repairs in question were going on, other repairs not due to the collision were carried on at the same time, and that therefore if these other repairs were not insignificant, the maintenance, wages, and perhaps the dry-docking charges, if drydocking was necessary for both kinds of repairs, should be divided. The testimony is not clear as to whether or not the other repairs were insignificant. Therefore this point is referred to the commissioner if the parties cannot agree upon the proper apportionment.