Peter Nesbitt **THOMSON**, Appellant and Cross-Appellee,

v.

**UNITED STATES of America,** Appellee and Cross-Appellant.

No. 7844.

United States Court of Appeals Fourth Circuit.

Argued April 17, 1959.

Decided May 21, 1959.

Thomas F. McGovern, Attorney, Department of Justice, Washington, D. C. (John M. Hollis, U. S. Atty., Norfolk, Va., and A. Andrew Giangreco, Asst. U. S. Atty., Alexandria, Va., on brief), for appellee and cross-appellant.

Before HAYNSWORTH, Circuit Judge, and HOFFMAN and BOREMAN, District Judges.

HAYNSWORTH, Circuit Judge.

The San Marcos, constructed and commissioned as an instrument of destruction, continues, long after her death, to exact her toll. But mariners must exercise care to avoid her, and the District Court's finding of fault on the part of the Moby Dick was supported by the evidence and his application of the rule of divided damages was appropriate.

The USS Texas, an armored vessel of 6300 tons, was one of the first United States battleships. She was at Santiago Bay in 1898, but was stricken from the Navy list in 1911. As the target ship, San Marcos, she was deliberately sunk by naval gunfire in the Chesapeake Bay approximately six and one-half nautical miles southwest of Tangier Sound lighthouse. She had a mean draft of twenty-two and one-half feet, so that, sunk in twenty-eight feet of water, much of the vessel remained above water. As earlier she had been the means of proving the effectiveness of the Navy's armor piercing shells, in 1921 the wreckage was used for Mitchell's famous demonstration of the effectiveness of aerial bombardment. Much of the broken and twisted wreckage still remained above water until 1944 when the exposed portions were largely shot away in gunnery practice. Since approximately 1955, no part of the wreckage has been awash even at low tide.

In 1940 the small freighter, Lexington, ran upon the San Marcos Wreck and sank.[1] In 1949, the oyster boat, The

Landon Gerald Dowdey, Washington, D. C., for appellant and cross-appellee.

1. See Baltimore, Crisfield & Ononcock Line, Inc. v. United States, 4 Cir., 140 F.2d 230.

T. H. Anderson, collided with the wreckage and sank.[2] A 65-foot Coast Guard Cruiser, an 83-foot Coast Guard Cruiser and the 68-foot yawl, Torbatross, successively fouled the wreck in 1953, 1954 and 1955. Finally, the yacht, Moby Dick, ran upon the wreckage in 1957 sustaining damage and losses which occasioned this action by her owner.

The location of the San Marcos Wreck was marked by a single red and black horizontally banded bell buoy with a red flashing light showing twelve feet above water. The letters "WR" on the sides of the buoy identified it as a wreck marker, but it was anchored in thirty feet of water approximately two hundred and twenty-five feet seaward from the nearest part of the extensive wreckage. With an anchor chain ninety feet long, wind and tide might carry the buoy three hundred feet from the nearest part of the wreckage.

That more precise marking was required is clear in the light of the intentional sinking of the ship and the reduction of its visible parts. The previous casualties, as well as official correspondence of Coast Guard officials, show that the location and extent of this very hazardous obstruction to navigation was insufficiently marked and delineated. Indeed, the United States here makes no contention that it was faultless; it contends only for divided damages because of the asserted negligence, found by the District Judge, of the captain of the Moby Dick.

The Moby Dick, a 55-foot, twin-screw diesel yacht of Canadian registry, was proceeding northward through the Intracoastal Waterway. She was manned by Captain Simms, a Canadian with extensive training and experience in navigating and handling ships and boats and a licensed officer in the British Merchant Marine, and by a steward. Captain Simms had laid out his course from Norfolk, Virginia to Annapolis, Maryland. The Moby Dick left West Norfolk early on the morning of April 22, 1957 in fair weather. After she had entered the Bay, however, the wind freshened out of the northeast and increased in velocity as it swung to the east. Because the boat was rolling and pitching, Captain Simms sent the steward into the cabin to protect the furnishings from breakage, while he, alone on the flying bridge, handled the boat. By radio-telephone, he learned from two other yachts that the wind was not so strong under the lee of the Eastern Shore. Sometime after leaving Rappahannock Spit buoy to port, Captain Simms decided to deviate from his generally northern course to head into the easterly wind and seek more favorable conditions. At 13 knots, he proceeded on his new course of approximately 80° true until he raised a red and black banded buoy on his starboard bow. He then came another 10° to starboard for the purpose of closing the buoy, identifying it and thus fixing his position. Though the bridge was approximately fifteen feet above the water line, spray was coming over its windshield, and objects abeam were more easily and clearly seen than those forward. Nevertheless, he did not slacken speed nor did he radically alter his course. When, on his new course of approximately 90° true, he brought the buoy on his starboard beam at a distance of about two hundred and fifty feet, he was able to make out, for the first time, the letters "WR" on the buoy. Instantly, he realized it was the San Marcos Wreck buoy, but almost at that instant his boat fouled the wreck.

Captain Simms knew of the San Marcos Wreck. He had noticed its location on the chart when he laid out his course to Annapolis, but had given it no particular thought for his intended course up the main channel of the Bay would not bring him close to the wreck. When he abandoned the course he had laid out, however, and turned to the east, he should have given some thought to what hazards and reference points he might encounter.

---

2. See Somerset Seafood Co. v. United States, 4 Cir., 193 F.2d 631.

It semed impractical precisely to lay out a new course. He could only estimate his position at the time of his turn, for he had left Rappahannock Spit buoy astern some time earlier, and it was hardly possible to use accurately his dividers and parallel rulers on the wave-tossed boat. Furthermore, it was his intention, not to make the weather shore or any particular reference point, but merely to move to the eastern side of the Bay until, encountering improved conditions, he could turn north again with less risk and discomfort. Brief reference to the chart which was folded and weighted before him, however, would have disclosed the fact that he was likely to encounter one of two bell buoys, each of which was red and black horizontally banded. The southernmost of these and the one least likely to be encountered, if his estimate of his position at the time of his turn was correct, was a bifurcated channel buoy marking the entrance to the channel leading into Tangier Sound. The other buoy, approximately three nautical miles roughly NNE of the first, and very likely to be encountered upon his new course if his estimate of his position at the time of his turn was correct, was the San Marcos Wreck buoy. Under these circumstances, the sight of a red and black horizontally banded buoy, which might have been the Tangier Sound channel marker approachable from every direction by vessels of the Moby Dick's draft, but which, more likely, was the San Marcos Wreck buoy, approachable only from those directions which did not cross the wreckage, should have been the occasion for alarm and unusual caution. Sight of the buoy should have resulted in immediate and radical changes in course and speed, for it was a herald of danger long before the dread letters "WR" added their emphasis.

Captain Simms had no opportunity for leisurely study of his charts after abandonment of his intended course. His duties as helmsman and lookout demanded his attention. The Moby Dick was equipped with an automatic pilot, but it had been in disrepair and, though repair had been attempted, it was untested, and Captain Simms was unwilling to rely upon it and did not use it. His one crewman had no experience in the handling of boats and was below engaged in the seemingly demanding duty of protecting movable furnishings. Still, consultation of his chart was not an impossibility, for Captain Simms closed the buoy for the purpose of identifying it and thus fixing his position by reference to his chart. If Captain Simms had no doubt that, after identifying the buoy, he could have consulted his chart to determine his exact position, there appears no good reason he could not have looked briefly at the chart to see what buoys were within sight of his predictable course.

Testimony was offered that in Chesapeake Bay red and black banded buoys marked many divisions and junctions of channels, and that one, without any other reference data, might assume that, more likely than not, such a buoy served that purpose rather than the marking of a wreck. Captain Simms, however, was not without reference data. In the area in which his new course was intended to take him, there were only two buoys, each similarly colored, and the one he was most likely to encounter was the one marking the San Marcos Wreck. He had no right to assume, without question, that the sighted buoy was the other.

Most of the argument in this case has been concerned with our system of buoyage. In our lateral system, proceeding from seaward, red buoys and markers with even numbers must be passed on the starboard hand; black buoys with uneven numbers must be passed on the port hand, while red and black horizontally banded buoys may be passed on either hand. 14 U.S.C.A. § 87. Obviously, a wreck between the channel and the shore may be effectively marked by a single red or black marker, but obstructions in otherwise vast expanses of navigable waters, bifurcations and junctions of channels are not so easily identified. Red and black banded buoys suggest to the mariner optional channels which, depending upon his destination, he may select, but

his option of passage upon either hand does not suggest that the red and black banded buoy is closely approachable from every direction. The solid red or solid black marker clearly indicates it may not be approached from two of its quadrants, but the red and black banded markers do not invite approach through every quadrant. All of the literature, the light lists and the charts show their use to mark optional courses to avoid shallows, middle ground, wrecks or other obstructions. Vessels following established channels may safely accept the indicated option, but such banded buoys do not suggest that they may be safely approached across the shallows, the wreckage or obstructions, the presence of which they indicate.

■ The District Court found Captain Simms negligent in proceeding into the northern quadrant of the buoy. It may be, as the owner of the Moby Dick suggests, that such a buoy, without other information, inherently is incapable of suggesting that quadrant from which it is not safely appproachable, but the light list states that such buoys when used to mark wrecks are usually on the seaward side of the obstruction, and the presence of the buoy itself, with such information as Captain Simms had, or should have had, was a warning to stand off until he could make certain how, and from what quadrant, the buoy was safely approachable. Having sighted the warning, to drive, without reduction of speed or any change of course except a minor one, to bring the warning buoy closer abeam, until his boat crashed into the obstruction of which the buoy gave obvious, if inexact, warning was negligent. Prudence required an abandonment of his course and speed. He could have idled his engines or turned radically to the south or to the north, until, belatedly consulting his charts and lists, he made certain that, whether the buoy was the one or the other of the two possibilities, it was safely approachable from his position on his heading. He had at hand upon his boat the answers to his quandary; if he did not choose to forearm himself with them, he cannot now contend, with conviction, that he exercised due care when, after the warning which sight of the buoy afforded, he neglected to inform himself or to check his perilous course into imminent danger.

We think the District Court was quite correct in dividing the damages.

■ The United States appeals from the District Court's determination of the total damages as being $39,629.03. The cost of salvage and repairs was agreed upon, but the United States contends the allowance for the loss of personal property, though less than the amount claimed, was excessive. The extent to which such claims should be discounted calls for the exercise of the discretion of the District Judge. Whether we might have discounted the claim as much or more than the District Judge did, is beside the point. There was no failure to exercise his discretion and no abuse of it.

Complaint is also made of the allowance of Captain Simms' salary, maintenance and expense for ninety-nine days.

■ Demurrage is not allowable damage in a case of this sort, for valuation of the loss of use of pleasure craft is highly speculative and immeasurable. The Conqueror, 166 U.S. 110, 17 S.Ct. 510, 41 L.Ed. 937. Direct expense such as wages of a captain and crewmen are not uncertain, however, and are allowable to the extent, and so long as, they are shown to have been reasonably necessary for the protection of the vessel, the successful completion of salvage and repair operations, or her subsequent efficiency. The Conqueror, supra; The A. A. Raven, 3 Cir., 231 F. 380; The Commonwealth, D.C.S.D.N.Y., 297 F. 651; Fisk v. City of New York, D.C.S.D.N.Y., 119 F. 256. Here the matter was handled by a stipulation which lacks desirable detail, but we think the record as a whole warrants the conclusion of the District Court that the salary and expense of Captain Simms was allowable for the period it fixed.

Affirmed.