THE JAMES McWILLIAMS.

NEW JERSEY SHIPBUILDING & DREDGING CO. v. JAMES McWILLIAMS BLUE LINE, INC.

No. 302.

Circuit Court of Appeals, Second Circuit.
May 5, 1930.

Leo J. Curren, of New York City (George V. A. McCloskey, of New York City, of counsel), for appellant.

Alexander, Ash & Jones, of New York City (Edward Ash, of New York City, of counsel), for appellee.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

Libelant's dredge No. 9, while anchored and held fast by spuds in the vicinity of Diamond Reef, off the Battery, East River, New York, was struck by the last barge in a tow that was being taken from New York Bay up the East River by claimant's tug James McWilliams. The tow collided with the rear port corner of the dredge causing damage to the latter. An interlocutory decree was granted to libelant holding the tug liable for injuries sustained by the dredge because of the negligent navigation of the tug, and appointing a commissioner to report upon the damages. The interlocutory decree is not questioned, and the only errors assigned on this appeal relate to items of damage allowed by the commissioner and confirmed by order of the court.

It is first contended by the appellant that the item of $2,344, consisting of cost of repairs, towing, and surveys, should not have been allowed. But this was granted by the commissioner and the District Court upon conflicting evidence, and, under familiar rules, should not be disturbed except for the clearest reasons.

It is objected that, when a survey was made the morning after the collision, no injury was discovered except to the port stern extension of the dredge, the repair of which, including dry-docking, would only cost $315. But there was ample testimony that the day after the collision a leakage developed about the forward starboard spud well around the bolts in the bottom of the hull which held the lower spud well casting in position. Four months before the date of the collision, a new casting had been installed in the starboard spud well, all necessary sheathing had been done, and caulking and planking furnished. There was testimony that the blow of the collision was heavy, and that, when it occurred, the forward starboard spud, weighing about eighteen tons, was down in the rocky bed of the river and was so rigid that a heavy blow on the stern forward stud would tend to bend and displace the bolts which held the lower spud well casting in position and would cause the forward starboard spud well to leak. The leaking, which began as soon as the dredge was operated the day after the collision, seems more naturally attributable to the collision than to theoretical causes based upon alleged faulty construction of the spud well explained by claimant's expert. It was found to be attributable to the collision by the commissioner and the District Court. The cost of repairs of the forward spud well was estimated on a second survey held shortly after the dredge began to leak at the forward spud well at $1,754, and that sum was paid for such repairs.

Objections are made to the charge for towing the dredge to the dry dock by the tug Princess and back to Diamond Reef by the Dictator. These items of expenditure are shown in Libelant's Exhibits 17 and 18, were approved by the commissioner, and no exceptions were filed to the report in respect to either of them. These objections are entirely unfounded.

There may have been some doubt about the charge of $150 for the supervision of the repairs at the dry dock by the carpenter representing libelant, but no specific evidence was offered in criticism of it and the item, after allowance by the commissioner and the court, should not be disturbed by us.

Two surveys became necessary because of the injuries that were discovered in the forward spud well after the first survey, and the charges for the surveys were reasonable. Likewise the dry-docking was proper in view of the repairs that had to be made to the forward spud well and casing, even though it might not have been required, if the damage disclosed by the first survey, which was to the rear of the dredge and only a little below

the water line, had been all that in fact existed. The item of $2,344, relating to cost of repairs, towing, and surveys is allowed. Donovan v. New York Trap Rock Co. (C. C. A.) 271 F. 308; The Hisko (C. C. A.) 34 F.(2d) 123.

The court below found $4,434.21 as damages for loss of the use of the dredge during the 6⁵⁄₁₆ days during which her service was interrupted in the dry-docking and repairs occasioned by the collision. This sum represented estimated average daily net earnings, plus daily expenses, during the 405 days which the dredge was found to have worked on the Diamond Reef contract. The court adopted the foregoing measure of damages for lack of proof of the rate for which the dredge might have been chartered.

In The Conqueror, 166 U. S. at page 127, 17 S. Ct. 510, 516, 41 L. Ed. 937, the Supreme Court said:

" * * * The best evidence of damage suffered by detention is the sum for which vessels of the same size and class can be chartered in the market. Obviously, however, this criterion cannot be often applied, as it is only in the larger ports that there can be said to be a market price for the use of vessels, particularly if there be any peculiarity in their construction which limits their employment to a single purpose.

"In the absence of such market value, the value of her use to her owner in the business in which she was engaged at the time of the collision is a proper basis for estimating damages for detention * * *."

See Sugar Products Co. v. Mobile & Gulf Nav. Co. (C. C. A.) 268 F. 815.

In the present case the District Court attempted to follow the rule in The Conqueror, supra. That decision, as well as our own in The North Star, 151 F. 168, The Winfield S. Cahill, 258 F. 318, and Newtown Creek Towing Co. v. City of New York, 23 F.(2d) 486, makes it clear that mere proof that a vessel is laid up for repairs, together with a statement of the business earnings of her owner, forms too speculative a basis on which to assess damages. It must be shown with reasonable certainty that she would have been employed if she had been in good repair and that her average daily earnings would have amounted to the sum sought to be recovered for each day's detention. If, as here, there was no sufficient proof of detention damage based on the sum for which the dredge might have been chartered, and the owner was consequently obliged to fall back on profits to show the value of her use, libelant had to establish (1) whether she lost employment by reason of the repairs; (2) what were her average earnings when employed.

Libelant failed to prove that it lost anything on the Diamond Reef contract by reason of the detention. So far as appears, that contract was completed no later than it would have been but for the detention, and the New Jersey Shipbuilding & Dredging Company got its pay under that contract in full. But it was proved that the dredge was taken for work on another contract that libelant had at Negro Point immediately after March 17, 1925, when it was no longer needed to operate at Diamond Reef. We think it a reasonable inference from this that the dredge was taken to Negro Point 6⁵⁄₁₆ days later than it would have been but for the delay caused by the repairs, and was therefore delayed 6⁵⁄₁₆ days in its work upon the Negro Point contract. There is, however, no proof of average daily earnings on the Negro Point contract, and we are asked to estimate the value to libelant of the use of dredge No. 9 on the basis of the yield of a single dredging contract. It was long ago said by Justice Story that "the probable profits of a voyage, either upon the ship or cargo, cannot furnish any just basis for the computation of damages, in case of marine tort." The Apollon, 9 Wheat. at page 376, 6 L. Ed. 111. It was likewise said in Packard v. Director General, 41 F.(2d) 557, 1924 A. M. C. at page 1089, that "monthly earnings under the present contract might be, and probably would be, a deceptive test * * * unless it appeared that she could be hired continuously at such figure."

It may be argued that the Negro Point contract, like the Diamond Reef job, may have been done on time, and, if so, the libelant lost nothing under that contract. But this, though true, seems to us a fanciful argument. If there was, for a long period in the future, work available for dredge No. 9 (which was shown to have been a unique dredge and more efficient for many purposes than any other dredges which libelant was using), we think it fair to say that No. 9 was delayed throughout its future work to the extent of the 6⁵⁄₁₆ days wasted in connection with the collision and the repairs. Dredge No. 9 was a so-called rock dredge, while No. 1 was employed for sweeping, and No. 13 for removing mud. The detention of No. 9 may have caused no loss of money on a particular contract, but it deprived the owner of an efficient dredge for that number of days of use. The profits on the Diamond Reef

contract furnished no adequate means of computing damages, not because the dredge did not lose employment when laid up, but because profits from a single contract did not furnish a fair basis on which to base a rental value. The Apollon, supra. We hold that proof of earnings of dredge No. 9 under that contract alone does not furnish a sufficient basis for an award of detention damages. There should have been proof of the earnings of the dredge upon other contracts upon which it might have been employed and at least on the contract at Negro Point on which it went to work as soon as it had finished at Diamond Reef. A fair average based upon the daily earnings made by the dredge in the business in which it was engaged at about this time, and not limited to a single contract which might have been unusually advantageous, would serve as a basis for estimating the loss of libelant during the period of detention. The earnings of the dredge are relevant, not because the libelant is entitled to recover lost profits, but as a basis for estimating the charter hire of such a dredge and as a substitute therefor.

It is contended by claimant that dredges No. 1 and No. 13 earned a much larger share of the payments for work at Diamond Reef than the $23,197.88 which the court below allowed, and that the figures on which the daily average earnings of dredge No. 9 were computed were therefore too large. The evidence relating to this feature of the case is not satisfactory. It is said on behalf of claimant that vouchers 39 to 42 of Exhibit 22 show that a large amount of earnings counted as derived from the work of dredge No. 9 were in fact made by dredge No. 1—the only dredge at Diamond Reef after March 17, 1925. While the testimony of Rostock and Buckley indicates that these vouchers principally represented payments for prior earnings, which the government would not pay for until some cleaning up involving an inconsiderable amount of work was completed; yet, after a careful examination of the record, we are unable to determine why $645.31, representing the first two items of voucher 42 of Exhibit 22, should have been the only sum included in the payments after March 17, 1925, for the work of dredge No. 1. Perhaps the findings of the commissioner as to the net earnings of dredge No. 9 were correct, but more precise proof was needed.

We have no criticism of the general method of arriving at the net earnings of dredge No. 9, nor of adding thereto the daily expenses of the dredge during repairs. As it seems to have been reasonably necessary to keep the crew together and to pay various other expenses during the period of drydocking, the libelant was subjected to this outlay without being able to realize anything from the use of the dredge during that period. In calculating net earnings of No. 9, the court had deducted expenses from gross receipts derived from the operation of the dredge. Item 11, Exhibits 16 and 25. If expenses which continued during the detention should be disregarded, the cost of operating the dredge would in effect be deducted twice in estimating what was the yield to libelant.

The original books of the libelant were not before the trial court. It is possible that the insufficiency of the proof of just what dredge No. 9 earned might have been supplied if they had been in evidence and subject to analysis. At any rate, clearer evidence of the earnings of dredge No. 9 is needed to support the calculations made by the court.

The cause should be remanded to the District Court, with direction to allow libelant the sum of $2,344 as the expense of repairs, towing, and surveys, and such further sum as damages for detention as may be shown in view of this opinion. The libelant should be allowed interest from December 15, 1923, to April 20, 1926, and from October 28, 1929 the date of the decree appealed from, to the date of the decree to be finally granted upon all sums recoverable.

Decree is reversed, with one-half costs to appellant.