## THE PENELOPI.

### No. 16556.

District Court, E. D. New York.

March 9, 1944.

Crowell & Rouse, of New York City (E. Curtis Rouse and George L. Varian, both of New York City, of counsel), for libellant.

Dow & Symmers, of New York City (Wilber E. Dow, Jr., and Joseph M. Brush, both of New York City, of counsel), for cross-libellant.

GALSTON, District Judge.

The matter comes before the court on exceptions filed by both sides to the report of the special commissioner.

By stipulation of libellant and cross-libellant an interlocutory decree was entered which provided that the balance due the Todd Erie Basin Dry Docks, Inc. (hereinafter to be referred to as Todd) for certain repairs to the Penelopi be fixed in the amount of $20,500, and the cross-libel of the Polar Companie de Navegacion (hereinafter to be referred to as Polar) referred to the special commissioner to ascertain and compute the amount of the damages, if any, sustained by the cross-libellant as the result of an unexplained period of thir-

ty-one days beyond the number of days contracted for the making of the repairs.

▪ It appears that the Penelopi at the Todd shipyards' underwent repairs which included the conversion of the vessel from a coal burner° to an oil burner. The work was not completed until December 27, 1941. The period of unexplained detention was from 5 P. M. on November 26, 1941 to 5 P. M. on December 27, 1941. In view of the heavy burden imposed on those who seek damages for wrongful detention of their vessels as laid down in The Conqueror, 166 U.S. 110, 17 S.Ct. 510, 41 L. Ed. 937, and re-stated in The North Star, 2 Cir., 151 F. 168, Aktieselskapet Bonheur v. San Francisco & Portland Steamship Co., 9 Cir., 287 F. 679, Newtown Creek Towing Co. v. City of New York, 2 Cir., 23 F.2d 486, the mere fact of an unexplained delay of the vessel for thirty-one days in the Todd shipyard cannot, in and of itself, give the right to recover demurrage. To prove damage for that period indeed it was incumbent upon Polar to prove not merely that there was a demand for tonnage during the period from November 26 to December 27, 1941, but also that it was willing to charter the vessel to some known agent for a specified voyage at an agreed rate. Concededly, once the vessel was not repaired within the period specified in the contract, Polar found itself in great difficulty in respect to negotiating with available charterers.

▪ Though it will be recalled that Paramythiotis testified that he could not negotiate for the charter hire during the detention period because he did not know when the vessel would be free, it is significant that during that time he or his company was in correspondence with the British War Ministry in the effort to get a ship's warrant. Moreover, Helmbold, Director of Operations and Traffic of the Maritime Commission, testified that there was no rule or regulation during November or December, 1941, which would have prevented the Commission from approving a proposed charter merely because the ship was under repair, and that a firm offer to charter within a range of delivery of loading dates anywhere up to sixty days thereafter would have been considered acceptable. But no excuse is shown in the record for failure of Polar to negotiate a charter on the assumption that the vessel would be ready for delivery from the shipyards with-

in the contract period. Or stated otherwise, there is nothing in the record to show that Polar was justified in anticipating that there would be a breach of the contract by Todd in respect to re-delivery. The failure of such proof of efforts by Polar to negotiate a charter leaves the matter of its damage in the speculative realm. Undoubtedly the special master was sensitive to the desirability of making good to Polar the loss of the use of its vessel for the unexplained period of thirty-one days. But this may very well be a case of "wrong without damage". Apparently Polar was hard put to prove damage and its sole evidence in respect to the net earnings of the ship results from a post-contract voyage. There is no showing of what the vessel earned during the voyages that preceded the laying up of the vessel for repairs.

Added to the difficulties of Polar to establish efforts during the detention period and the contract time which preceded to negotiate a charter of the vessel, the libellant offered proof that the vessel was refused a clearance certificate or warrant by the British Ministry of War Transport; that the Penelopi was out of class from September 2, 1941 to January 22, 1942; that she was uninsured from November 19, 1941 to January 22, 1942.

It was stipulated that on or about October 10, 1941, S. Paramythiotis, Ltd., applied to the British authorities in writing for a certificate for permission to insure the Penelopi to satisfy the ship's warranty attached to the P. & I. policy; that on or about October 13, 1941 the Ministry of War Transport in London refused the application and that neither the Steamship Penelopi nor its owner nor agents had a British ship warrant or certificate between the dates September 1, 1941 and December 27, 1941. Paramythiotis, referring to some negotiation either at the end of December, 1941, or the first days of January, 1942, testified that he was unable to reach an agreement with the representative of the British Government in respect to the chartering of the Penelopi.

Moreover, as early as October 14, 1941, S. Paramythiotis, Ltd., from the London office, wrote to the Polar S. S. Corporation enclosing a copy of a letter from the Ministry of War Transport, dated October 13, 1941, wherein it is stated that the Penelopi, inasmuch as it was "Allied-owned", should be chartered to the Ministry of War Trans-

port for the purpose of assisting in the Allied war effort, and it is said:

"As soon as you are in a position to advise the City Chartering Office that the vessel will be so chartered, all facilities under the control of the Ministry will be gladly made available to the vessel."

Also Polar encountered difficulties about insurance. In a letter, Exhibit NN, dated November 26, 1941, from S. Paramythiotis, Ltd., to the Polar S. S. Corporation, it appears that the Ministry of War Transport, on being requested for permission to effect a port risks insurance, informed Paramythiotis:

"They are unable to grant this facility unless and until the vessel is offered to them on time charter."

As late as January 5, 1942 a communication from Paramythiotis, Ltd., to Polar contains this passage:

"In view of a further serious communication from the Ministry of War Transport on Friday, the 2nd inst., and the fact that they requested us to inform you they would be prepared to charter the vessel for U. S. A./South African business at Maritime Commission rates."

Insurance on the vessel expired on November 19, 1941 and the vessel remained uninsured until January 22, 1942.

The proof fails to show that Polar was willing to accept any charter offer during the detention period or before it appeared that the repairs would not be completed within the contract period. The position of the British War Ministry was such as in effect seriously to hamper the Penelopi's available market for hire, and while not a complete black list, such as was considered in The Winfield S. Cahill, 2 Cir., 258 F. 318, Jaslow v. Waterbury Rope Co., 2 Cir., 9 F.2d 232, Clyde S. S. Co. v. City of New York, 2 Cir., 20 F.2d 381, The Pocahontas, 2 Cir., 109 F.2d 929, the failure of the cross-libellant to show any other efforts during the contract period or the detention period to negotiate the vessel for hire constitutes a failure of proof of damages sustained within the definition laid down by the authorities hereinbefore cited.

■ The finding of the special master that the cross-libellant should be allowed crew expenses in the total sum of $1,176.50 for wages and victuals during the detention period is sustained by the evidence and the law. The Silver King, D.C., 43 F.2d 723, Interlake S. S. Co. v. 251,000 Bushels of No. 2 Mixed Corn, D.C., 18 F.2d 291, The Bulgaria, D.C., 83 F. 312, The James McWilliams, 2 Cir., 42 F.2d 130.

Todd's exceptions, therefore, except as to items 12, 13, 14 and 15, will be sustained in accordance with the foregoing opinion.

■■ If the cross-libellant were entitled to demurrage on actual proof of damages during the thirty-one days of unexplained detention, the cross-libellant's first exception would be sustained, for whatever period was consumed in the cleaning and painting of the Penelopi between the period of re-delivery of the vessel by Todd and the delivery to the Moore-McCormack Lines as charterer is immaterial. Also I believe that had the cross-libellant sustained its burden of proof in respect to lost earnings, such lost earnings should have been calculated on the face of a dead weight tonnage of 10,660. In other respects the cross-libellant's exceptions will be overruled.

■ The result reached herein, however, is apparently so harsh in the light of an admitted unexplained detention of thirty-one days during a period of active demand for tonnage that leave should be granted to Polar on a proper showing to re-open the reference for the purpose of establishing its burden of proof as to actual loss sustained. Such application, if any, should be made within ten days from the entry of the order to be submitted in accordance with the foregoing decision.