WEEKS DREDGING & CONTRACTING, INC., Plaintiff,

v.

B. TURECAMO TOWING CORP. and Turecamo Coastal & Harbor Towing Corp., Defendants and Third-Party Plaintiffs,

v.

UNITED STATES of America, Third-Party Defendant and Fourth-Party Plaintiff,

v.

RIVER TOWING COMPANY, Fourth-Party Defendant.

No. 77 C 516.

United States District Court, E. D. New York.

Jan. 11, 1980.

Edward R. Korman, U. S. Atty., Brooklyn, N. Y. (Alice Daniel, Acting Asst. Atty. Gen., Washington, D. C., Gilbert S. Fleischer, and David P. Howe, Tort Branch, Civil Division, U. S. Dept. of Justice, of counsel), for third-party defendant and fourth-party plaintiff.

Boal, Doti & Larsen, New York City (Joseph E. Doti and Vincent E. Catoggio, New York City, of counsel), for fourth-party defendants.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Weeks Dredging & Contracting, Inc. ("Weeks"), a New Jersey corporation, brought this action against B. Turecamo Towing Corp. and Turecamo Coastal and Harbor Towing Corp. (collectively "Turecamo"), Delaware corporations. The complaint alleges that on May 23, 1975, Turecamo's tug, the Turecamo Girls, negligently caused the Scow Weeks No. 254 (the "Scow"), owned by Weeks, to run aground and sustain damage between the North Brother and South Brother Islands in the East River in New York harbor.

Turecamo brought a third party complaint against the United States, asserting that it was negligent in failing to maintain a buoy on station, to show the position of a rocky obstruction on the United States Coast and Geodetic survey chart for the area, and to maintain the channel properly.

The United States brought a fourth party complaint against River Towing Co. ("River Towing") and American Dredging Company. All claims against American Dredging Company were discontinued prior to trial. The fourth party complaint against River Towing alleges that its tug Gwynedd was proceeding westbound through the channel between the Brother Islands at about the same time as the Turecamo Girls was proceeding eastbound, and that whatever damage the Turecamo Girls sustained was caused by the Gwynedd's negligence in failing to allow sufficient room for safe navigation.

Lawrence M. Honig, New York City, for plaintiff.

Grainger & Tesoriero, New York City (Celestino Tesoriero, New York City, of counsel), for defendants and third-party plaintiffs.

By the pre-trial order Weeks' complaint was deemed amended to demand judgment against the United States and River Towing.

This court has jurisdiction under 28 U.S.C. § 1333. The following constitutes the court's findings of fact and conclusions of law.

### 1. The Incident

The tug Turecamo Girls left Port Reading, New Jersey, on the morning of May 23, 1975, bound for Bowery Bay, with the tug made fast on the Scow's port side and "toed in" at about a 15° angle. The stern of the tug extended beyond the stern of the Scow.

The Scow, unmanned and without self propelled power, had the following dimensions: 234 feet in length, 53 feet in breadth, and 22.5 feet in depth. It had a gross tonnage of 2,410 and was loaded with wet sand. At the time of the incident it was drawing 17 feet on an even keel. The Turecamo Girls was a 200 ton, twin screw tug of 2,000 horsepower, was 95.6 feet long, 27.2 feet wide, and 12.1 feet deep, and was drawing 9 feet forward and 12 feet aft.

At approximately 11:45 A.M., with Carl L. Vreeland in the pilot house, the tug was proceeding with the Scow in a generally easterly direction in the East River, having just passed through Hell's Gate. The weather was clear. The unit was bucking an ebb current of approximately 4.5 to 4.9 knots with engines full on and was making no more than three knots over land. The tug's radar was not in use. Vreeland testified that he was monitoring channel 13 on the VHF radio.

Meanwhile the Gwynedd had left Rikers Island Mooring at 11:30 A.M. towing four light scows astern in single file. The scows were each some one hundred feet long and forty feet wide. As the Gwynedd departed the stake boat where the scows were picked up, Edward Kuhle, acting as captain, made a security call on channel 13. He continued to monitor the channel but received no response.

The Gwynedd, which had a 700 horsepower engine, proceeded in a westerly direction to approach the easterly end of the channel between the Brother Islands. When the Gwynedd reached approximately the intersection of the 48' latitude and the center line of the dredged Greater New York Channel, Kuhle sighted the Turecamo Girls and the Scow "coming out from behind" North Brother Island, about to enter the Brother Islands channel at its northern extreme, and crossing over to the south.

Judge Brieant dealt in *Bouchard Transportation Co., Inc. v. United States*, 75 Civ. 5275 (S.D.N.Y., decided May 12, 1978), with the grounding of a tug in the same general area on May 24, 1975, the day following the occurrence involved in this case. He described the markings in the channel as follows. "The Brother Channel is marked on the starboard or southerly side of the beginning of the narrow area between the two islands by Black Can buoy No. 9. About 450 feet easterly of Can 9 and within the shoal area on the southerly side of the Brother Channel is a 20 foot fixed navigation aid (tower) with a bell and flashing green 2½ second light. At the easterly end of the Brother Channel is Can RB, a red and black can buoy which notes the presence of South Brother Island as an obstruction, and marks the beginning of the natural channel between the two Brother Islands for westbound traffic, and also marks the most westerly side of the dredged channel to Greater New York Terminal. The northerly side of the Brother Channel is marked by a red nun buoy No. 8 and red nun buoy No. 6 at the respective ends of the North Brother Island side of the Channel, and there is a fixed mark on North Brother Island near nun buoy 8, all as shown on Chart 226." An updated chart, 12339 (plaintiff's Exhibit 4) made no changes of significance in this case.

When he sighted the Turecamo Girls, Kuhle made a second security call stating that the Gwynedd and its tow were shaping up for the Brother Channel. The Turecamo Girls did not respond. At that time the Gwynedd could not do otherwise than go through the channel. Kuhle slowed to let the Turecamo Girls cross to the south, and

the Gwynedd's flotilla ran at about one knot faster than the tide, passing so close to the red nun buoy number 6 that two of the scows grazed it.

The Turecamo Girls kept coming at full speed. Vreeland, who was not navigating by instruments but was "eyeballing", steered the Turecamo Girls to the south of the channel when he saw the Gwynedd entering the channel. A small pleasure boat of some thirty five feet preceded the Gwynedd through the channel.

Vreeland was apprehensive about the passage, believing that both his unit and the Gwynedd's flotilla were in a dangerous position. He feared that some of the Gwynedd's barges might swing over to the south and collide with the Turecamo Girls or the Scow. Vreeland therefore sagged to starboard as far as he thought he could.

The vessels passed within about 150 feet of each other at that point where the channel is narrowest, having a width of only 300 feet. Within a few minutes, at approximately 12:10 P.M., the Scow went aground hard. "I stopped good", as Vreeland put it.

Vreeland unsuccessfully attempted to free the Scow by backing and filling. Then he sent the tug's deck hand, James Kiernan, Jr., aboard the Scow. A line was put out to the tug from the stern of the Scow. But that line parted. Finally a hawser was rigged to the port bow of the Scow, which had commenced to list to port, and after about fifteen or twenty minutes it was pulled free.

At no time did Vreeland take any bearings or fixes, and it is therefore impossible to determine the precise point where the grounding took place.

■ The court finds that the Turecamo Girls did not fulfill its duty toward the Scow to navigate prudently and carefully.

Kuhle testified that, in view of the shoaling at the east end of the channel just north of Can RB, he would not have passed through the Brother Channel with a 17 foot draft vessel of the weight of the Scow and that he knew of no one who went through with that deep a draft. He testified, and the court finds, that a prudent seaman under the circumstances presented here would have taken the safer and far wider channel north of North Brother Island.

Even assuming *arguendo* that it was prudent for Vreeland to choose to pass through the Brother Channel, the court finds that he was negligent in another respect. He could have slowed his engines sufficiently to allow the Gwynedd's flotilla to pass before Turecamo Girls reached the Black Can buoy No. 9. The Turecamo Girls was bucking a tide of 4.5 to 4.9 knots and could have slowed practically to a standstill without losing control. Yet Vreeland kept both engines at full speed ahead. Had he slowed, the Gwynedd would have passed the Turecamo Girls well before it reached the narrowest part of the channel.

The Gwynedd was not at fault. It drew 7 to 7½ feet, and its barges were light, drawing only 1½ feet. Kuhle gave a security call when he departed the stake boat, and at the time he sighted the Turecamo Girls coming out from behind North Brother Island his flotilla was shaped up to go through the channel. He then had no other choice.

■ The claim of the Turecamo Girls against the United States is based on the contention that it negligently failed to depict on the chart a rock ledge on the line between Black Can buoy No. 9 and Can RB (sometimes referred to in the testimony as the junction buoy) and that the Scow grounded on this ledge. The ledge's location, as established by the testimony of Norman Porter, a consulting engineer and surveyor, appears on defendant Turecamo's Exhibits G and I, and its profile on the line between the two buoys appears on Exhibit I.

The United States cannot be held responsible for Vreeland's failure to take the route north of North Brother Island or for his failure to slow down until the Gwynedd flotilla had passed through the narrow part of the channel. But even if the court assumes that Vreeland was prudent in entering the channel when he did, the court finds

that Turecamo has not proven that any negligence by the United States in failing to chart an obstruction caused the grounding.

As was the case in *Bouchard Transportation Co., Inc. v. United States, supra,* the tug took no bearings or fixes even after the scow had grounded. As Judge Brieant stated in that case, "[o]n striking an underwater object, at the very least a fix should have been established immediately." Because no fix was taken there is a failure of proof as to the exact location of the Turecamo Girls and the Scow at the time of the incident.

Vreeland testified that when the Scow went aground the Turecamo Girls was inside the Black Can buoy No. 9 and the Can RB, with the flashing green 2½ second light well astern and to starboard. But this is inconsistent with the testimony of Kiernan, who said that the Scow, when he boarded it immediately after the grounding, was headed directly for the Barretto Point tanks. If that was so, the Scow, when it supposedly struck the ledge found by Porter, must have been proceeding on a heading substantially more northerly than the line between Black Can buoy No. 9 and the Can RB, and the flashing green light would have been off the Scow's port quarter. In that event the Scow prior to striking the ledge would have been outside the line between the Black Can buoy No. 9 and the Can RB.

But this kind of testimony based on memory and general estimate is unreliable. Because of Vreeland's failure to take fixes Turecamo has not been able to show that the ledge found by Porter caused the damage to the Scow. The testimony does not demonstrate whether the Scow was within the buoyed channel or outside it. It is as likely as unlikely that the Scow struck ground inside the two fathom line marked on the chart.

Accordingly the claim of the Turecamo Girls against the United States has not been proven. It is unnecessary to decide whether the United States was negligent in failing to show on the chart the ledge found by Porter.

## 2. *Damages*

■ Weeks claims damages for repair to the Scow and also for demurrage, that is, for the profits lost while the Scow was laid up undergoing repairs.

### a) *Repairs*

The only substantial issue with respect to repairs is whether all of the damage permanently repaired was occasioned by the May 23, 1975 incident. Edward F. Ganly, a marine surveyor who surveyed the damage for Turecamo, testified that he believed that certain damage existed prior to May 23, 1975, and that, if this damage alone had been repaired, the cost would have been $21,700. He based his conclusion that not all of the damage was caused by the same incident on the fact that at the time of the survey on August 26, 1975 some dents contained marine growth while other areas were scraped clean. Ganly's opinion was unqualified at the trial, but his handwritten notes made while attending the survey recite that he was "not sure all damage due to same casualty" (plaintiff's Exhibit 38). However, Ganly admitted that the repair "inevitably involves both [elements of repair] as they are superimposed one on the other." Therefore it would not affect the damages recoverable that some portions of the Scow which had to be repaired as a result of the May 23, 1975 incident had been earlier damaged.

In any event the court accepts the testimony of plaintiff's witness Thomas R. Pedersen that all the damage was occasioned by the May 23, 1975 occurrence. His testimony on the critical issues in the case appeared to the court to be thoroughly credible. He said that there was no appreciable marine growth when the Scow was out of water in the latter part of April 1975 prior to the incident. His testimony is supported by photographs he took (plaintiff's Exhibit 25) of the underside of the Scow on April 24, 1975. The growth which was present and seen by Ganly when the Scow was in dry dock on August 26, 1975 for temporary repairs must have developed after April 24, 1975, most of it since May 23, 1975.

The fact that all the striations on the underside of the Scow did not run in precisely the same direction does not show that more than one incident was the cause of the damages. Because of the manner in which the Scow was backed and filled and finally pulled free there were naturally marks running in more than one direction.

The court finds the total damages for repairs to be $137,250.88, consisting of $132,494 for permanent repairs (plaintiff's Exhibit 18), $3,585.88 for temporary repairs (plaintiff's Exhibits 19 and 23), $350 for the engineer's survey (plaintiff's Exhibit 21), and $821 (as stipulated) for towing the Scow to and from dry dock.

b) Demurrage

Plaintiff is also entitled to damages for those profits which were lost, "or may be reasonably supposed to have been lost" as a result of the Scow's being laid up for repairs due to Turecamo's negligence. *The Conqueror*, 166 U.S. 110, 125, 17 S.Ct. 510, 41 L.Ed. 937 (1897). As that opinion pointed out, the best evidence of profits lost is the amount for which a similar vessel could have been chartered in the market. 166 U.S. at 127, 17 S.Ct. 510. But this large, clam shell Scow was never held out for charter. It was specifically built for Weeks along with a sister scow to be used as part of a dredging team consisting of a dredge, the two identical scows, and a so-called work boat which moved the dredge. The scows were very costly to build and could only be used efficiently with large equipment. The usual practice was to fill one scow and tow it to the disposal point and back while the dredge filled the other scow.

Since no market for the use of the Scow can be established through a history of charters, "the value of her use to her owner in the business in which she was engaged at the time of the collision [repair] is a proper basis for estimating damages for detention, and the books of the owner, showing her earnings about the time of the collision [repair], are competent evidence of her probable earnings during the time of her detention." *The Conqueror*, 166 U.S. at 127, 17 S.Ct. at 516. The cases sometimes use language reciting that the lost profits must be proven "with reasonable certainty", *see, e. g., Moore-McCormack Lines v. The Esso Camden*, 244 F.2d 198, 201 (2d Cir.), *cert. denied*, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 37 (1957), and that the court will not "speculate" as to what earnings were lost. *Demetrius Maritime Co., Ltd. v. S/T "Connecticut"*, 463 F.Supp. 1108, 1111 (S.D. N.Y.1979). But any decision as to what events would have occurred in the absence of the grounding and the detention for repairs involves a supposition based on inferences from events which did occur. No such supposition can be certain. The test should be what profits more probably than not would have been earned had the incident not transpired.

Weeks asks for demurrage for four days, August 25 through August 28, 1975, during which the Scow was in dry dock undergoing temporary repairs, and for thirty-six days, March 11 through April 15, 1976, during which the permanent repairs were made.

Weeks showed the actual days the Scow was working for the period February 19, 1973 through December 31, 1976 (plaintiff's Exhibit 28). The Scow was busy 77.46% of the calendar days for 1973, 71.51% for 1974, and 75.61% for 1975. In 1976, if the days the Scow was in dry dock for the repairs and was traveling to a job in Florida are counted as work time, the Scow would have been working 310 out of 365 days. If the permanent repair period but not the travel time in Florida is counted as work time, the Scow would have been working 278 days out of 365 or 76.47%. Since the Scow did not ordinarily work on Sundays, we may reasonably deduct five days from that total representing the Sundays that fell during the repair period. This would yield a figure of 74.79%.

This evidence demonstrated that the use of the Scow over a span of almost three years was fairly consistent and that there was available reasonably constant work which did not slack off in 1976. From this one can fairly infer that the Scow could have been utilized during the period in question had it not been laid up for permanent repairs.

Under the circumstances the court finds that Weeks has made a sufficient showing that the Scow would have been at work on approximately 74% of the 36 days needed for the permanent repairs. Weeks is therefore entitled to demurrage for 26 days. However, Weeks may not have demurrage for the four days during which temporary repairs were performed. It is reasonable to conclude that Weeks could have scheduled those repairs for an idle period and probably did so.

Turecamo contends that Weeks cannot recover any demurrage unless it can show that it lost or turned down a specific contract because of the need for repairs. But the Court of Appeals in *The James McWilliams*, 42 F.2d 130, 132 (2d Cir. 1930), held in a somewhat analogous situation that a plaintiff need not show loss on a specific contract, saying that the detention of a dredge "may have caused no loss of money on a particular contract, but it deprived the owner of an efficient dredge for that number of days of use." So here it would be unreasonable to deny recovery unless Weeks showed the loss of a specific contract. There was undoubtedly dredging work available in the market. Not all of Weeks' work was obtained on long term contracts. The Scow also did pick up work, on occasions lasting no more than one day, and this plainly could not be planned for long in advance.

Moreover, Weeks was entitled to plan for the repair period and was not required to seek work for that period merely for the purpose of rejecting it. The Scow experienced no continuous idle period of more than fifteen days (not counting Sundays) during the three years for which records were introduced. It would be unjustifiable to conjecture what Weeks would have experienced, much less could have anticipated, an idle period of thirty six days. Certainly the defendant and third and fourth party defendants did not show that Weeks could have foreseen such a slack period in which to make the repairs.

The testimony shows that Weeks did not receive from the Army Corps of Engineers until April 12, 1976 the notice to proceed (defendant's Exhibit E) on the dredging contract which Weeks fulfilled following the thirty six day period, and that work on the contract did not actually commence until April 28, 1976. However, Weeks, because of its long standing relationship with the Corps of Engineers, could have advanced those dates so as to permit performance of the work at an earlier time.

Weeks was, of course, obligated to mitigate damages, *Ellerman Lines, Ltd. v. The President Harding*, 288 F.2d 288 (2d Cir. 1961), and to try to schedule the permanent repairs at a time when the effect on revenue would be minimized. No doubt Weeks did so. It was in the dredging not the litigating business. But there is no warrant in the evidence for Turecamo's suggestion that Weeks could have postponed those repairs indefinitely or until it saw that the Scow would have been idle for as long as the repairs required. The Scow's certification from the Coast Guard was only good until August 14, 1976 (plaintiff's Exhibit 11), before which time the Coast Guard would have required the repairs. In addition, the Scow was scheduled to go in July 1976 on a sea voyage to perform a dredging contract in Florida, and the Coast Guard would have insisted on completion of the repairs before that voyage was undertaken.

It may be assumed that during a part of the thirty six day period the Scow would have been idle. But that contingency is fairly accounted for by restricting recovery of demurrage to only twenty six days.

There remains the question of what the Scow would probably have earned per working day. Weeks showed that for the thirty four days the Scow worked between April 28, 1976 through June 12, 1976, it earned a net $157,471.89 or $4,731.53 per working day (plaintiff's Exhibit 29). This was based on a price of $1.77 per cubic yard dredged and disposed of. An analysis of the cubic yards of material and revenue produced on various jobs utilizing the Scow from January 1975 through July 1976 (plaintiff's Exhibit 30) shows an average

price per cubic yard of $1.7935. The contract price for the job undertaken following the permanent repairs was, counting the mobilization and demobilization payment, $1.77 per cubic yard (plaintiff's Exhibit 32). The latter figure appears reasonable.

In determining the net revenue of the Scow Weeks subtracted from the gross revenue the costs including a charge for the dredge. It was, of course, open to the defendant and third and fourth party defendants to introduce evidence to show that those costs are understated. But they did not do so. Weeks' *prima facie* case giving a reasonable estimate of the earnings of the Scow per day is sufficient in the absence of countervailing proof.

Weeks is entitled to demurrage in the amount of $4,631.53 a day for twenty six days or a total of $120,419.68.

Weeks may also have prejudgment interest, but only from the dates when the payments were made for the respective repairs. *Frost v. Gallup*, 329 F.Supp. 310, 314 (D.R.I.1971).

Settle judgment. So ordered.