STANDARD MARINE TOWING
SERVICES, INC., Plaintiff,

v.

M.T. DUA MAR, her engines, tackle, boilers, apparel, etc., Thomar Navigation Pte. Ltd., Thome & Co. Pte. Ltd., TUG T.S.I. 27, her engines, tackle, boilers, apparel, etc., T.S.I. 27, Inc., T & R Towing Company, Inc., Moran Towing & Transportation Co., Inc. and Moran Towing Corporation, Defendants.

Nos. 86 Civ. 1579(CBM), 86 Civ. 4630, 86 Civ. 5651 and 86 Civ. 7352.

United States District Court,
S.D. New York.

March 13, 1989.

Waesche, Sheinbaum & O'Regan, New York City by Francis M. O'Regan, for plaintiff.

Healy & Baillie, New York City by William F. Losquadro, for defendants Thomar Navigation Pte. Ltd., Thome and Co. Pte. Ltd. & M.T. Dua Mar.

Olwine, Connelly, Chase, O'Donnell & Weyher, New York City by Renato C. Giallorenzi, of counsel, for defendants T.S.I. 27, Inc. & Tug T.S.I. 27.

## OPINION

MOTLEY, District Judge.

This is an action for profits lost and expenses incurred from February 12, 1986 to April 15, 1986, as a result of a collision at sea which disabled a ship owned by plaintiff Standard Marine Towing Services ("Standard Marine"). Having heard the evidence presented in a two day trial held on October 5th and 11th of 1988, the court finds for the plaintiff and awards damages of $46,559.33 (breaking down to $25,698.32 for lost profits and $20,861.01 for expenses). We reserve decision on awarding pre-judgment interest and costs until the parties make further submissions to the court. By mutual agreement between the parties, defendants T.S.I. 27, Inc. and the Tug T.S.I. 27 are liable for 72.5% of the damage award (totalling $33,755.51), while defendants Thomar Navigation Pte. Ltd., Thome & Co. Pte. Ltd. and the M.T. Dua Mar are liable for 27.5% of the damage award (totalling $12,803.82).

## THE PARTIES

The parties to this action are as follows:

a) plaintiff Standard Marine Towing owns the tanker barge Lindsay Frank II;

b) defendant T.S.I. 27, Inc. owns the tug T.S.I. 27;

c) defendants Thomar Navigation Pte. Ltd. and Thome & Co. Pte. Ltd. own and operate the ship M.T. Dua Mar.

All other defendants in this case are no longer parties to the action and have no involvement with the instant dispute.

## BACKGROUND

The following facts are undisputed. On February 11, 1986, during a snowstorm, the tanker barge Lindsay Frank II collided with the ship M.T. Dua Mar in the body of water between Staten Island and Bayonne, New Jersey (which is called the Kill Van Kull). The Lindsey Frank II is in the "clean oil" trade and was transporting approximately 25,000 barrels of number two oil at the time of the collision (Transcript of Trial Proceedings—hereinafter "Tr."—at 27; Ex. 18-A—Invoice # 25048). She is a "dumb" barge (not self-propelled) and was being towed by the tugboat T.S.I. 27 at the time of the accident.

The Lindsay Frank II was damaged by the collision and part of her cargo was off-loaded into the barge Nathan Berman, another ship owned by the plaintiff. Both barges were towed to the Lindsey Frank II's original destination where the entire cargo was discharged (Tr. 28–29). After that, the Lindsey Frank II was towed to the Standard Tank Cleaning Corporation Facility at Bayonne, New Jersey—a company affiliated with plaintiff—where her tanks were cleaned from February 12th to the 15th in preparation for repair work (Tr. 29, 82–85; Ex. 14). On February 15th, the Lindsey Frank II was towed to First Marine ("First Marine") Shipyard on Staten Island—a company affiliated with plaintiff—for repairs.

A collision damage survey was conducted at First Marine on February 18th and 19th (Tr. 30, 167–68). Several shipyards submitted bids to repair the barge on February 20th. The repair work was awarded to First Marine which submitted the lowest bid, $161,474, and the lowest number of working days, fifteen, to complete the job. (Tr. 30–32, 168–69; Ex. 17–C). The term "working days" means eight hour days, Monday to Friday, excluding weekends and

holidays. (Tr. 31, 169). Repair work on the Lindsey Frank II commenced on February 21st (Tr. 175).

Despite First Marine's bid, collision repairs were not completed until April 15th. Owner's work unrelated to the collision damage kept the barge out of service until May, when, all work having been completed, the Lindsey Frank left First Marine Shipyard and returned to work.

ISSUE

Since the parties have already settled claims for the physical damage to the Lindsey Frank II, the sole issue before this court is profits lost and expenses incurred by plaintiff while the barge was out of service due to its collision damage. This period dates from the day of the collision, February 11, 1986, to the day collision repairs were completed, April 15, 1986. No damage claim is made for the detention period attributable to owner's work, i.e., April 16, 1986, until the day the Lindsey Frank II left First Marine shipyard and returned to service. *See Bouchard Transportation Co. Inc. v. The Tug "Ocean Prince" et al.*, 691 F.2d 609, 614 (2d Cir. 1982).

In support of our holding in plaintiff's favor, the court makes the following findings of fact and conclusions of law.

DISCUSSION

■ A claim for detention is " '[d]amages for lost profits arising from the loss of use of a vessel for repairs after a collision or other maritime tort.' " *Bouchard Transportation Co. Inc. v. The Tug "Ocean Prince" et al.*, 691 F.2d 609, 612 n. 2 (2d Cir.1982) (citing *Bolivar County Gravel Co. v. Thomas Marine Co.*, 585 F.2d 1306, 1308 n. 2 (5th Cir.1978)). The owner of a vessel damaged through the fault of another is entitled, over and above the cost of collision repairs, to an award for profits lost and expenses incurred during the detention necessary to make the repairs. *The Conqueror*, 166 U.S. 110, 125, 134–35, 17 S.Ct. 510, 516, 519, 41 L.Ed. 937 (1897); *Bouchard* at 611–12; *Moore–McCormack Lines, Inc. v. The Esso Camden*, 244 F.2d 198, 203–04 (2d Cir.1957).

In determining profits to be awarded, it is not necessary for a plaintiff to prove that it lost or turned down a specific contract or contracts because the vessel was in need of repairs. *The James McWilliams*, 42 F.2d 130, 132 (2d Cir.1930); *See also Weeks Dredging and Contracting, Inc. v. B. Turecamo Towing Corp.*, 482 F.Supp. 1053, 1058 (E.D.N.Y.1980) (test is not specific contracts lost but whether profits more probably than not would have been earned had the accident not transpired). The measure of detention is "the amount the vessel would have earned in the business in which she has customarily been employed." *Moore–McCormack Lines* at 201. Nonetheless, to be recoverable, lost profits must be proven with a reasonable degree of certainty. *The Conqueror* 166 U.S. at 125, 17 S.Ct. at 516; *Bouchard* at 612.

■ In early 1986, the activities of the Lindsey Frank II consisted of transporting oil or gasoline from one terminal to another in the New York harbor or its vicinity, or transporting cargo from a vessel at anchor to a terminal (Tr. 25–26). The vessel was not on charter and did not operate on a charter basis at the time of the collision (Tr. 126). When customers needed product moved from one terminal to another, they would call Standard Marine's dispatcher and place their order by telephone (Tr. 26).

At trial, Ms. Susan Frank, the president of Standard Marine, testified that the winter season—specifically the months of January to April—is a very busy season for barges that transport what is essentially home heating oil (Tr. 26, 106–08, 154). She went on to say that, year after year during the winter months, the Lindsey Frank II serviced customers and terminals on a regular basis (Tr. 25–26, 118–119). These customers included The Belcher Company of New York, Inc. and Pittston Marine Transport Corp. among others (Tr. 26; Exs. 18–A; 23). Owing to these regular customers and the generally busy winter season, Frank testified that, but for the accident, the Lindsey Frank II would have been steadily and gainfully employed from Feb-

ruary 11th to April 15th, the detention period at issue (Tr. 68–70, 118–19).

Frank's testimony is corroborated by the logs of the Lindsey Frank II for 1985 (Ex. 2) and 1986 (Ex. 3). In January of 1985 and 1986 the Lindsey Frank II worked 26 days (Tr. 37–38; Exs. 2, 3, 4). She worked 20 days in February of 1985 (Ex. 2, 4) and 9 out of 11 possible workdays in February of 1986 (this because the collision took place on February 11, 1986) (Ex. 3, 4). The barge worked 25 days in March of 1985 and 14 out of 15 days from April 1 to April 15, 1985 (Ex. 2, 4). The logs clearly show that the Lindsey Frank II was a busy barge during the winter months of 1985 and in the winter months immediately preceeding the collision in 1986.

Crediting Franks testimony and taking it together with the documentary evidence received at trial, this court concludes that plaintiff has sustained its burden of showing that the Lindsey Frank II would have been steadily and gainfully employed during the period in 1986 when the vessel was laid-up for collision repairs. Plaintiff is therefore entitled to damages for lost profits from February 11, 1986 to April 15, 1986.

As to the amount of damages, we believe that the fairest measure of lost profits in this case are the profits made during the period in 1985 corresponding to the detention period in 1986. This is because Frank testified that the Lindsey Frank II serviced a regular clientele during the winter months and that these customers used the vessel year in and year out. Consequently, in calculating profits lost during the detention period, profits made from February 11 to April 15, 1985, appear to this court to be the best measure of "the amount the vessel would have earned in the business in which she has customarily been employed". *Moore–McCormack Lines* at 201. And since we have documentary evidence showing the profits made by the Lindsey Frank during the relevant period in 1985 (Exs. 22–31; *see also* accompanying affidavit of Susan Frank dated December 29, 1988), the profits lost during the detention period in 1986 can be shown with a reasonable de-

gree of certainty. *The Conqueror* 166 U.S. at 125, 17 S.Ct. at 516; *Bouchard* at 612.

The "invoice register" or "sales journal" for the Lindsey Frank II shows gross earnings in February, 1985, as $20,411.52; in March, 1985, as $39,685.38; and from April 1 to April 15, 1985, as $15,719.91 (Ex. 22, 25). The vessel's "general ledger" shows that total expenses for the Lindsey Frank II were $16,088.41 for February, 1985; $24,103.32 for March, 1985; and $16,456.80 for April, 1985 (Exs. 26, 27). Subtracting total expenses from gross profits leaves a net profit of $4,323.11 for February, 1985 (Ex. 31). This amount, multiplied by $17/28$, results in net profits of $2,624.75 for the 17 days covering February 12th to February 28th (the day following the collision to the end of the month) (Ex. 31). Gross profits minus total expenses for March, 1985, show a net profit of $15,582.06 (Ex. 31). Since the expenses for the entire month of April, 1985, were $16,456.80, the expenses for April 1 to April 15, 1985, can reasonably be calculated to be 50% that amount or $8,228.40 (Ex. 31). Subtracting expenses of $8,228.40 from gross earnings of $15,791.91 for the period April 1 to April 15, 1985, leaves a net profit for that period of $7,491.51 (Ex. 31).

Adding together the net earnings for the relevant periods in February, March and April of 1985—$2,624.75 plus $15,582.06 plus $7,491.51—gives a total net earnings of $25,698.32 for February 12 to April 15, 1985, the dates corresponding to the detention period caused by the collision in 1986. Accordingly, we award plaintiff $25,698.32 for profits lost as a result of the February 11, 1986, collision which damaged the tanker barge Lindsey Frank II and necessitated her absence from service from February 12 to April 15, 1986, in order to effect needed repairs.

Defendants object to an award for lost profits during the full detention period claiming that First Marine Shipyard took an unreasonably long time to effect repairs on the Lindsey Frank II. They note that the original repair bid submitted by First Marine gave fifteen working days as the time within which repairs would be com-

pleted (Ex. 17–C). Assuming that repair work started on February 21, 1986, this bid means that the job should have been completed by about mid-March and not, as actually occurred, in mid-April. Despite the fact that repairs took longer than originally stated, we decline to modify plaintiff's award for lost profits.

Frank testified that, in her experience, a shipyard's estimate of the time required for vessel repairs is neither firm nor guaranteed (Tr. 32–33). In deciding who is awarded a repair job, she stated that surveyors "look for the lowest price and don't really look at the days" (*Id.*). According to Frank, estimated repair time is used primarily by the surveyors as a guideline for determining whether a shipyard's bid for the cost of the job is reasonable (*Id.*) From the "owner's perspective", she said, a given repair time "is not a guaranty" (Tr. 32–33).

Frank's testimony is corroborated by the testimony of Vincent Klusmeyer, the manager of First Marine, and Paul Taubler, Standard Marine's port engineer. Klusmeyer, who has been in the shipyard business for thirty-five years (Tr. 158), testified that a bid giving a time period for repairs is just an estimate of how long the shipyard believes the job will take (Tr. 169). He stated that the number of estimated days is subject to change and that factors such as manpower, weather and delivery of materials can influence or change this estimate (Tr. 169–70). Taubler's testimony is essentially the same. "Problems" and "contingencies", he stated, always make the repair take longer than originally estimated: "[t]hey tell you they are going to deliver in fifteen days and it usually goes longer than that and it usually costs more as well" (Tr. 339–40). The testimony of these two witnesses is uncontradicted and the court finds it worthy of belief.

As to the reasons for the delay, Klusmeyer testified that frequent bad weather during the months of February, March and April—meaning rain, snow, high winds or low temperatures—delayed work on the Lindsey Frank II and caused repairs to take longer than anticipated (Tr. 183–86, 190–96). Official United States weather reports, published by the National Oceanic Atmospheric Administration, corroborate Klusmeyer's testimony by showing that rain, snow, high winds and low temperatures were recorded for many days in February, March and April of 1986 (Ex. 21, 21–A). Common sense would also indicate that the weather in these months would make outdoor repair work on a marine vessel particularly difficult. In addition to bad weather, Klusmeyer testified that manpower problems contributed to repair delays (Tr. 183, 185–86, 195–96) as did time spent in the ordering and delivery of materials necessary to effect repairs (Tr. 183, 195–96, *see also* 321–22). Finally, Klusmeyer stated that there was no reason for First Marine to delay the repair work (Tr. 197). Since the shipyard has only limited pier space, it is to First Marine's advantage to perform repair work as quickly as possible in order to free up facilities for the next job (*Id.*). The quicker a job is done, Klusmeyer testified, the more First Marine earns (*Id.*).

Klusmeyer's testimony is corroborated by port engineer Taubler (Tr. 336). He testified that he visited the Lindsey Frank II regularly during the vessel's stay at First Marine to ensure that repair work was being done properly (Tr. 300, 336). Taubler stated that repair work on the Lindsey Frank II was performed "in a first class manner" (Tr. 300) and that the shipyard did not cause and was not responsible for any undue delays in effecting repairs (Tr. 336). Neither Klusmeyer's nor Taubler's statements were persuasively contradicted at trial and we deem their testimony to be worthy of belief.

We also note that the delay in completing repairs to the Lindsey Frank II was not substantial. Assuming that work could not begin on the vessel until February 21, 1986, the original estimate would have the job finished on March 13th, fifteen working days after repairs began (Ex. 13). The delay until April 15th represented only twenty-three additional *working* days beyond the time originally estimated for repairs (*Id.*). This is not, as defendants put it, a case of allowing detention damages when it took "63 days to repair a vessel

which plaintiff's affiliate stated could be repaired in 15 days." Defendants' Proposed Conclusion of Law No. 9. One of the yards which bid on the repair job, Union Dry Dock and Repair Company, gave an estimate of twenty-one working days to repair the Lindsey Frank II (Exs. 17–C, 19). First Marine's completion of the job by April 15th was only seventeen working days beyond this estimate, suggesting further that the shipyard's delay in repairing the Lindsey Frank II was not inordinate.

Reviewing both the documentary evidence and the testimony adduced at trial, we find no evidence that First Marine performed repair work on the Lindsey Frank II in anything less than an efficient and workmanlike manner. Nor do we find that the shipyard willfully or negligently delayed repairs on the vessel. The time given by First Marine in its repair bid was just an estimate; the delay in finishing the job was not inordinately long and could be attributed to problems of weather, manpower and materials. Moreover, the current learning in this Circuit appears to be that, absent "evidence of any culpable delay in the completion of repairs", defendants cannot hold the plaintiff liable for the fact that the work took longer to complete "than the surveyors estimated at the outset. The time periods for construction or repair work are so difficult to control that delays in the completion of repair work should be treated as part of the risks which the tortfeasor assumes." *Reliable Transfer Co., Inc. v. United States of America,* 1973 A.M.C. 930, 937 (E.D.N.Y.1973) (not officially reported), *aff'd,* 497 F.2d 1036 (2d Cir.1974), *vacated on other grounds and remanded,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), *remanded,* 522 F.2d 1381 (2d Cir.1975). Accordingly, our award of detention damages will not be reduced because repair work on the Lindsey Frank II took longer than originally estimated.

■ Defendants also object that plaintiff failed to mitigate its damages by using another vessel from its fleet to carry on the work of the Lindsey Frank II while she was undergoing repairs. However, the evidence adduced at trial shows that plaintiff did not have any comparable vessel available to substitute for the Lindsey Frank II (Tr. 71). Frank testified that of the ten petroleum barges in plaintiff's fleet, four vessels—the Sarah Frank, Laurie B, Jodie K and Bunker New York—were in the "black oil" trade and so were unfit to transport the "clean oil" carried by the Lindsey Frank II (Tr. 71–72, Ex. 10). The New England 29 and the American 21 worked out of the port of Boston and were unavailable for work in New York harbor (*Id.*). The Jane Frank is in the "clean oil" trade but could carry only 2,000 barrels in contrast to the 24,500 barrel capacity of the Lindsey Frank II (*Id.*). The same is true of the Nathan Berman with a capacity of only 12,700 barrels (*Id.*). In filling customer's orders, Frank testified that Standard Marine could not substitute a smaller vessel for the much larger Lindsey Frank II because of the greatly increased costs involved in moving large amounts of oil with a comparatively small tanker (Tr. 72–74). According to Frank, Standard Marine "really can't offer the customer a smaller boat for a larger boat, they just don't want it" (Tr. 74). Her conclusion is uncontradicted and accords with common sense.

The evidence shows that during the relevant period in 1986, the only vessel comparable in size and carrying capacity to the Lindsey Frank II was the Richard K (Tr. 72). It is in the "clean oil" trade and can carry up to 24,700 barrels (Ex. 10). However, while the Lindsey Frank II was out of service for collision repairs, the Richard K was fully occupied with its own work (Tr. 72, Exs. 11, 12). The log of the Richard K shows that it was steadily and regularly employed during the detention period of the Lindsey Frank II (Exs. 11, 12). In February, 1986, the Richard K worked twenty-four days and underwent needed maintenance and repairs on three more days (Tr. 283–84, Exs. 11, 12). In March, 1986, she worked twenty-five days and spent five in maintenance and repair (Tr. 285–86, Exs. 11–12). From April 1st to April 15th—the day collision repairs on the Lindsey Frank II were completed—the Richard K worked 11 days and took four for maintenance and repairs (Tr. 288–89,

Exs. 11, 12). So while the Richard K could have replaced the Lindsey Frank II, such a substitution appears to have been effectively impossible given the Richard K's own busy agenda.

Taking the record as a whole, this court is satisfied that between the Richard K's own operating schedule and the time spent on necessary maintenance and repairs, the vessel was steadily occupied while the Lindsey Frank II was disabled and could not have replaced the damaged barge or serviced her customers. And since the Richard K is the only ship in plaintiff's fleet which could realistically have been substituted for the Lindsey Frank II, plaintiff cannot be accused of failing to mitigate its damages by substituting another one of its vessels for the damaged barge. Accordingly, we decline to reduce plaintiff's award for lost profits on the grounds that it had other vessels available to replace the Lindsey Frank II and fill customer orders which would normally have accrued to the damaged barge.

■ As for the expenses plaintiff incurred during the detention period of the Lindsey Frank II, Exhibit 7 consists of pages from the general ledger of the vessel listing all her expenses for the months of January, February, March and April of 1986 (*See* Ex. 7). The document is part of Standard Marine's bookkeeping records: entries are made by the company's bookkeeper and are regularly reviewed by Standard Marine's president, Susan Frank (Tr. 51–54). She testified that the expenses listed are actual expenses, i.e., they are out-of-pocket expenditures actually incurred by plaintiff in connection with the period the Lindsey Frank II was laid-up for collision repairs (*Id.*). These expenses include crew wages and related FICA expenses; state and federal unemployment expenses; union expenses; food and travel; group insurance; maintenance and supply costs; parts and repairs; office expenses; outside contractors; fuel and lube oil costs; license, permits, survey and chemists costs (including wharfage charges); insurance expenses; legal expenses; equipment rental and other taxes (Ex. 7, Tr. 52–53, 57). Tak-

ing the record as a whole, we find that plaintiff has demonstrated with reasonable certainty the expenses chargeable to the Lindsey Frank II during her detention period. *The Conqueror* 166 U.S. at 125, 17 S.Ct. at 516; *Bouchard* at 612.

From February 12th—the day after the collision—to February 28, 1986, these listed expenses amounted to $9,121.35 (Ex. 7, 8, 9). In March, expenses totalled $8,125.03 (*Id.*). From April 1st to April 15, 1986—the day collision repairs were completed—expenses for the Lindsey Frank II came to $3,614.63. Adding these three periods together, we find that plaintiff has proven total expenses of $20,861.01 for the Lindsey Frank II during the time the vessel was laid-up for collision repairs (*Id.*).

Defendants object that plaintiff's insurance expenses are not recoverable and that certain other expenses listed in Exhibit 7 are not recoverable because they are overhead costs. They also object to the expenses incurred by plaintiff in keeping a barge captain on board the Lindsey Frank II during the vessel's detention period. Since we do not find these objections persuasive, we decline to modify our award for expenses.

Premiums for hull, protection and indemnity, and liability insurance continued to be paid on the Lindsey Frank II during the vessel's detention period (Ex. 7). Frank testified that the insurance coverage was in the form of an annual policy and did not contain a provision allowing a return of premiums for a lay-up period (Tr. 130–32). Since these insurance costs could not be reduced or avoided during the lay-up period, they are properly included as an out-of-pocket expense. *See Moore McCormack Lines* at 204 (money actually expended in maintaining the [vessel] during detention is an expense incurred by reason of the collision for which the owner is entitled to recovery). Furthermore, since insurance premiums and overhead costs—as well as the other items included in plaintiff's out-of-pocket expenses—were deducted from the gross earnings of the Lindsey Frank II in order to arrive at her lost net profits during the detention period, they should be

added as a recoverable item under expenses incurred during the vessel's lay-up. *See Moore McCormack Lines* at 203–04; *see also Pocahontas Steamship Co. v. M/V Detroiter,* 1948 A.M.C. 349 (S.D.N.Y. 1947) (not officially reported); *see generally* Roscoe, *Damages in Marine Collisions,* 97–98 (3d ed. 1929).

As for the wages of the barge captain, they are properly included as an expense item during the detention period if the presence of the barge captain was reasonably necessary for the protection of the vessel or to oversee repair operations. *See The Conqueror* at 135, 17 S.Ct. at 519; *see also Fisk v. City of New York,* 119 F. 256 (S.D.N.Y.1902) (cited in *Thomson v. United States of America,* 266 F.2d 852, 856 (4th Cir.1959)); *The A.A. Raven,* 231 F. 380, 389 (3d Cir.1916) (cited in *Thomson, supra* ).

Frank testified that it was Standard Marine's "custom and practice" to keep a barge captain on board its vessels while they were in shipyards in order to safeguard the barge and oversee the shipyard work being performed (Tr. 110–13, 116). She stated that the barge captain's presence on the ship was minimal and that he was kept on board only as was absolutely necessary to look after the barge and its repairs (Tr. 112–13, 116). Frank also testified that it is the "custom and practice" in the barge business that a shipyard permit an owner to keep a person on board a vessel to supervise shipyard repairs (Tr. 116). There is no evidence in the record to contradict Frank's assertions which accord with this court's perception of steps a reasonably prudent barge owner would take to protect so valuable an asset. *See The Conqueror* 166 U.S. at 135, 17 S.Ct. at 519; *see also The A.A. Raven, supra.*

We find unpersuasive defendant's assertion that the daily visits of port engineer Taubler to the shipyard obviated the need to keep a barge captain on board the Lindsey Frank II. Taubler did not remain at the yard to oversee repairs as did the barge captain; rather, the barge captain supervised the yard personnel during the repairs and reported to Taubler when he (Taubler) made his daily visits to the yard (Tr. 111, 312–314). Since Taubler's duties as Standard Marine's port engineer included looking after the other vessel's in plaintiff's fleet (Tr. 281), he could not reasonably be expected to spend his entire working day at the shipyard watching over the Lindsey Frank II. The record shows that it was the barge captain, and not Taubler, who was really plaintiff's "man on the scene". And since his presence was reasonably necessary to safeguard the barge and oversee repairs, his wages are an allowable expense recoverable in an award for detention damages.

INTEREST AND COSTS

Although it is an abuse of discretion to deny prejudgment interest in admiralty cases except under extraordinary circumstances, the district court has broad discretion to determine when interest commences and what rate of interest applies. *Independent Bulk Transport, Inc. et al. v. The Vessel "Morania Abaco" et al.,* 676 F.2d 23, 25 (2d Cir.1982). Since we do not feel that the parties' post-trial memorandum adequately address either prong of the interest question, we reserve decision of any award of pre-judgment interest until further arguments are submitted to the court. The same is true for the awarding of costs, which, in admiralty cases, is also discretionary with the district court. *Tanker Hygrade No. 24, Inc. v. The Tug Dynamic,* 233 F.2d 444, 448 (2d Cir.1956).

CONCLUSION

For the reasons stated in this opinion, this court finds for the plaintiff in the above entitled actions and awards damages of $46,559.33 (breaking down to $25,698.32 for lost profits and $20,861.01 for expenses). By mutual agreement between the parties, defendants T.S.I. 27, Inc. and the Tug T.S.I. 27 are liable for 72.5% of the damage award (totalling $33,755.51), while defendants Thomar Navigation Pte. Ltd., Thome & Co. Pte. Ltd. and the M.T. Dua Mar are liable for 27.5% of the damage award (totalling $12,803.82).

The court will delay entry of final judgment in these actions until a decision has

been reached as to the awarding of pre-judgment interest and costs.